## Com. ex rel. Langdon *v.* Patterson, Appellant.

## Com. ex rel. Louden et al. *v.* Bell et al., Appellants.

*Corporations—Meetings—Presiding officers—Adjourned meetings.*

A person who has been chosen to preside at a corporate meeting is entitled to call an adjourned meeting to order, and to continue to preside unless superseded in some orderly and recognized parliamentary manner.

*Corporate meetings—Disorder—Withdrawal—Quo warranto.*

A disorder occurred at a corporate meeting in which all parties participated. After the disorder had ceased, a portion of the stockholders withdrew for the purpose of carrying out a preconceived scheme to organize and run the meeting in their own interests. Their call to withdraw was not to all stockholders, but only to members of their own faction. They organized another meeting, but before voting sent an invitation to the other stockholders to come and vote. *Held*, that the acts of such meeting

COM. ex rel. LANGDON *v.* PATTERSON. Appellant. 477

1893.]                    Syllabus—Statement of Facts.

were illegal and that the invitation to the other stockholders was ineffectual to cure the radical defects of organization.

*Stock subscription—Voting of stock.*

Where a subscription to stock is not in writing, and is made for the purpose of creating an amount of stock sufficient to equal a proposed mortgage, but is not accepted by the treasurer of the company, and such subscription has not been paid in whole or in part, the stock so subscribed cannot be voted at a corporate meeting.

*Voting stock—Title—Vendor and vendee—Act of May 7, 1889.*

Prima facie the right to vote stock accompanies the legal title, but when the title is divided, and an equity exists, as between pledgor and pledgee, trustee and cestui que trust, or between vendor and vendee, with a title inchoate until payment, the right to vote is subject to the agreement of the parties. This is the rule, not only of the common law, but also of the act of May 7, 1889, P. L. 102.

A person owning stock in a corporation entered into a contract of present sale of the stock, and parted possession with it by delivery to a third party to be held in escrow until the vendee should comply with the terms of the sale, and agreed that in the meantime the right to vote the stock should be in the vendee. *Held*, that the vendor was not a present owner of the stock in any such sense as to entitle him to vote it.

Not considered whether the vendee could vote the stock thus acquired within sixty days of the election.

Argued Nov. 6, 1893. Appeals, Nos. 33 and 34, Jan. T., 1894, by defendants, Frank G. Patterson and G. T. Bell et al., from judgments of C. P. Blair Co., March T., 1893, Nos. 78 and 79, on verdicts for plaintiffs, Samuel P. Langdon and William Louden et al. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Quo warranto to determine validity of election of officers of Altoona, Clearfield & Allegheny Railroad Co. Before LANDIS, P. J.

From the record it appeared two writs of quo warranto were issued, the first to determine by what authority Frank G. Patterson assumed to exercise the office of the president of the Altoona, Clearfield & Allegheny Railroad Co., the second to determine by what authority G. T. Bell, A. C. Shand, W. A. Ambrose, C. A. Wood, M. Scott Gwin, T. H. Wigton, W. W. Yon, Thos. H. Greevy, John K. Patterson, H. A. Gardner, H. J. Davis and L. H. Cheatham, assumed to act as directors of said railroad.

478 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Statement of Facts. [158 Pa.

When the cases were called for trial, before the jury was sworn, counsel for defendants excepted to the order of the court that the cases should be tried together. Exception overruled and bill sealed. [13]

The facts appear by the charge of the court. The agreement therein referred to was as follows:

" Articles of agreement made and concluded this fifth day of January, A. D. 1893, by and between John Louden, William Louden, Andrew Kipple, W. L. Shellenberger, J. A. Canan, George S. Adams, S. J. Westley and W. S. Lee, parties of the first part, and Samuel P. Langdon, trustee, party of the second part, as follows:

" The said parties of the first part hereby sell, assign, and transfer unto the said party of second part, sixty per centum of the capital stock of the Altoona, Clearfield & Northern Railroad Company, for the price of fifty dollars per share, to be paid as follows: Five hundred dollars on the signing of this agreement, and the balance in sums of two hundred and fifty dollars per week, until the whole balance is paid, the said stock to be deposited with H. A. Gardner, cashier Second National Bank, of Altoona, Pa., to be held by him until fully paid for, when he shall deliver the same to said Samuel P. Langdon, trustee. In default of any payment aforesaid, the party of the second part hereby forfeits all money paid on account thereof, and the said H. A. Gardner, cashier, etc., is to redeliver the said stock to the parties of the first part, or their assigns. It is further agreed that the said Samuel P. Langdon, trustee, may, if he so desires, pay the price of said stock within sixty days from the date of this agreement and receive the said stock from the said H. A. Gardner. The said parties of the first part also agree to execute and deliver to said Samuel P. Langdon, trustee, on the signing of this agreement proper and legal proxies to enable and empower him to vote the said stock at any and all meetings and elections hereafter held by the stockholders of the said company, as he may desire, and to fully control the same at said meetings and elections. The said party of the second part also has hereby the privilege of purchasing the bonds of said company, held and owned by the parties of the first part, within sixty days from the date of this agreement, at par value."

The court charged as follows:

COM. ex rel. LANGDON *v.* PATTERSON, Appellant. 479

1893.]                    Charge of Court.

" The Altoona, Clearfield & Northern Railroad Company, a corporation chartered under the laws of Pennsylvania, and with their offices in the city of Altoona, in this county, desired, on the 9th of January, 1893, in pursuance of their by-laws, to hold its annual election for officers, directors and managers at its offices at 10 A. M. of that day. It seems public notice had been given of this purpose, and on that day a large number of the shareholders assembled at the place of meeting. Mr. F. G. Patterson was elected president of the stockholders' meeting and H. J. Davis secretary. A motion to adjourn to meet again on the 23d of January following was made by a member. This was moved to be amended by striking out 23d of January and inserting 3 P. M. of the same day. The amendment was put to the meeting for a vote and it was declared lost. The original motion was then put and declared by President Patterson carried.

" The relators, who are the plaintiffs in these issues, complain that the amendment was not defeated; that it was carried by a small majority; that a division was called for, and, on a count, there were sixteen votes for it and fourteen against it; but that the president nevertheless declared it lost. This is denied by defendants' witnesses, who say the vote was fairly counted and properly announced by the president. However, the meeting adjourned to meet on the 23d of January following. Certain proceedings after this were instituted in court in equity, and the court, inter alia, ordered the stockholders' meeting of the 23d of January to be again adjourned or postponed to the 23d day of February following. At this meeting very many, if not all, of the stockholders again appeared, either in person or by proxy. Prior to this date a meeting of the directors had been held, and it was then ordered that public notice of this stockholders' meeting be given by advertisement, as required by the by-laws, and it seems from the evidence that this was done. On this date and at a little before, or about 10 A. M., Mr. Canan called the members to order, and moved that William L. Shellenberger preside at the meeting. He says he put the motion, both affirmatively and negatively, and though there were certain negative votes, he declared it carried. At this juncture Mr. Patterson, who stands talking in the hall, came in, and claiming to have been already elected as president

480 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Charge of Court. [158 Pa.

by the meeting of January, and which had been twice adjourned, took his seat as president, and Mr. Davis took his seat as secretary. He at once took charge of the meeting. This was objected to by certain stockholders, who had brought there H. M. Baldrige and Martin Bell as their attorneys, to oppose Mr. Patterson's presidency of the meeting. This opposition they at once set up, and it was as earnestly replied to by Thomas H. Greevy and W. A. Ambrose, Esqs., attorneys. The former gentleman not being able to oust Mr. Patterson from the presidency and to seat Mr. Shellenberger, asked leave to file written protests. This was allowed. They were entered upon the minutes and have been read in your hearing.

" The next step was to elect officers. The protestants, who are the plaintiffs here, asked that the directors first assemble in meeting and elect judges or tellers of election. This was denied by the other party, and the latter exhibited an act of assembly which provides that when the directors failed to appoint judges the stockholders might do so. A motion authorizing the president to appoint three such tellers was made, put and declared carried. To this the others again protested, but the president appointed Mr. Amies, Mr. Hicks and Mr. Brant tellers, who were duly sworn and acted as tellers. Before the election was proceeded with a list of stockholders to be furnished by the treasurer, Mr. Westley, was called for by the protestants, but the president stated the secretary, Mr. Davis, had a correct list and the voting would proceed by this. During all these proceedings there was much noise, wrangling and confusion. The adherents of Mr. Shellenberger then decided, amid great excitement, to withdraw to the other room, separated by folding doors. After some had entered that room Mr. Westley attempted to close the door, when Mr. Patterson seized him and forbade the doors to be closed. One Dennis O'Connell, a policeman of the company, at some one's request, seized Westley. This elicited an excited demand for O'Connell's authority, when he produced it. The protestants were then requested by one of their number to withdraw from the office to Mr. Plack's private office across the hall to hold a meeting. This meeting was held by them by electing Mr. Shellenberger president, and N. C. Barclay secretary. They first held a meeting of directors, of whom there were seven or eight present, at which they

COM. ex rel. LANGDON *v.* PATTERSON, Appellant. 481

1893.]                          Charge of Court.

elected Mr. Parsons, Mr. Griffin and Mr. Wherry tellers, who were sworn and who counted the votes. At this meeting it is claimed there were voted 578 votes, a majority of 875, which they say was the whole number of shares legally issued; and by those votes they elected thirteen directors, of whom the nine who bring this suit were part. Whilst this meeting was in progress, those who remained in the office with Mr. Patterson also continued their meeting and elected Mr. Patterson president, and the directors, who are the defendants here, by casting for them 948 votes, they alleging that the whole number of shares legally issued was 1487, of which 948 was a majority. In this number were 600 shares issued the 23d of February, signed by the president, with the company's seal, and not attested by the secretary, and which, the plaintiffs claim, having been issued without the knowledge or authority of the board of directors and without having been actually subscribed, were illegally issued, and could not be counted.

"During the progress of both meetings, and after the cessation of all disorder, a request was sent by each meeting to the other to come over and vote, but in both cases the privilege was declined. The plaintiffs, the relators, claiming to have the majority, and, having voted a majority of the 875 shares in Mr. Plack's office, claim that the persons there voted for are the president and directors of the company, and that you should so find in this issue. If the meeting held by them in Mr. Plack's office was the regular and lawful meeting of the company under the by-laws of the corporation, and if, in pursuance of the call advertised, they there, as the owners of a majority of the stock, so voted, then they would be the president and managers of the corporation for the current year, and you should so find in this issue.

"The defendants, however, deny this. They contend that the call for the meeting was for a meeting at the offices of the company at 10 o'clock of Thursday, 23d of February, and that a meeting held at any other time or place by any of the stockholders than that so designated was not a lawful meeting; and any election held at any other place was no election and was void. They also claim that as they held the meeting in pursuance of the call, at the time and place fixed, that such officers as they elected were and are the lawful officers of the company.

482 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Charge of Court. [158 Pa,

That at their election 948 votes were cast for Patterson as president, and for G. T. Bell, A. C. Shand and others, directors; and as that number was a majority of 1475, the whole number of shares issued, as they claim, these gentlemen were elected.

" To this the relators, or plaintiffs, reply that of the 948 votes thus voted by Patterson and his associates, 600 were illegal because they were based upon so many shares of stock illegally issued, thus leaving only 348 votes as deposited for Patterson and his associates; and that number being less than 578, the number voted for W. L. Shellenberger and his associates, they say Patterson, Shand and others were not elected, and that Shellenberger and his friends were elected. It will be observed that the two votes, 348 of Patterson and 578 of Shellenberger, being added together make more than 875; but this discrepancy can be accounted for by Mr. John Louden voting Mr. Hicks's stock at his meeting, and Mr. Hicks himself voting his stock, 35 shares, at the Patterson meeting.

" Now the first question to be determined is, were the 948 votes voted at the Patterson meeting, and of which Mr. Patterson voted 773, all legal votes? If they were, it is an end of this controversy and your verdict would be for the defendants, because that number would be a majority of the shares of the stock of the corporation. It is contended, however, that 600 of them were illegal. The relators say the capital stock was only 875 shares; that the 600 shares were never subscribed for by Mr. Patterson; that there was no authority from the board of directors allowing him to subscribe for the 600 shares; that there is no book and nothing in writing to show such subscription; that he had no right, as president of the company, to call himself the individual owner of these shares; that he had no right to direct Mr. Westley, the treasurer of the company, in September, 1891, as he testified, to note his subscription; and that Mr. Westley never received such instruction and never did make any note of such a subscription; that Mr. Patterson never subscribed for the stock in writing; that Mr. Patterson himself never recognized his subscription from 1891 up to February 23, 1893, when he attempted to make use of it; that the directors never knew or heard of it till February, 1893; that when they authorized, in October, 1891, a mortgage for $60,000, it was not on the basis of his subscription, but because they thought they had a legal

COM. ex rel. LANGDON *v.* PATTERSON, Appellant. 483

1893.]                    Charge of Court.

right on other grounds and without knowledge of this; that no certificate was ever legally issued to Mr. Patterson for 600 shares of the stock; that a certificate taken from the stock book and signed and sealed by him as president and not countersigned by Mr. Westley, the treasurer, certifying his individual ownership of the 600 shares, was void and gave him no right nor title to the stock; that Mr. T. H. Wigton was at the same time endeavoring to get Mr. Westley to issue to him shares of the stock; and above all they say he (Patterson) never paid the ten per cent required by law nor anything for it to the company, and, therefore, there were no 600 additional shares of stock, and he had no right to and did not own 600 additional shares of stock.

" To this Mr. Patterson replies and says the company needed money, and was always anxious to get subscriptions of stock; that subscriptions were often made and not reported unless the money was paid in ; that he requested Mr. Westley, in September, 1891, to note his subscription of 600 shares, to which he, Westley, as treasurer, assented ; that he offered; both in Philadelphia and Altoona, to pay him, as treasurer, $30,000 by Mr. T. H. Wigton's check for that amount; that though Mr. Wigton, cashier of the Altoona Bank, did not have that amount in bank, yet he had made such an arrangement with Mr. Prevost, of Philadelphia, by drawing on him a sight draft, that he could have the cash in a few hours ; that Mr. Westley declined to sign the certificate and close the transaction, not because the cash was not on hand, which he waived, but because it would be against the interests of certain friends, or persons, known as the Langdon people, to whom it appears the relators had agreed to sell their stock.

" Now, these are the allegations mainly made by the parties. What does this evidence show ?   Whether in this manner subscriptions to stock were to be received; whether it had been the custom of the company and whether the board of directors would have approved the subscription, the proofs seem to show that the board had no official knowledge at least of this alleged subscription, and therefore took no action on it.   It was a matter wholly between Mr. Patterson and Mr. Westley.   Had Mr. Westley signed this certificate of stock and received the $30,000 and deposited it to the credit of the company, it is even possible that the board might still have repudiated the acts of these

484 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Charge of Court. [158 Pa.

officers and directed the return of the money, finding a sufficient reason for not increasing the paid-up capital of the corporation. But it did not proceed so far. [The certificate was not countersigned. It was signed only by Mr. Patterson and remained unused in his hands. But the chief essential to its vitality was wanting; no value had passed to the company for it. Nothing had been paid, and there was not the slighest consideration for it. A mere tender of payment gave Mr. Patterson no right to the stock. He tried to pay for it and perfected his arrangements to pay for it, but the official representative of the company refused to take it. It does not matter what his motives were for refusing. He did refuse, and whether his principal would have approved his action or not, the contract of sale of the stock to Mr. Patterson, if it had ever been made, was never completed; and hence he never got the 600 shares of stock. It would not be proper, therefore, to allow Mr. Patterson to vote on 600 shares of stock which never had any existence, and for which the company never received anything. We, therefore, instruct you that, of the 948 votes voted at the stockholders' meeting at the company's offices on the 23d of February, 600 shares were illegal and void, and are not to be counted; and this would be so whether they were challenged at the time or now in this suit.] [8]

" We come then to the question of the election on the 875 shares of stock which, it is not disputed, had been lawfully issued. Of these 348 were voted at the Patterson meeting and 578 at the Shellenberger meeting. Mr. Louden, at this latter meeting, voted 35 shares of Hicks's stock, and some other person voted, perhaps about 15 shares of stock belonging to others, when the real owners voted the same stock at the Patterson meeting. It will be seen that the voters in the Plack office voted at least 527 votes, which they claim is a majority of 875. The by-laws of the company prescribe that one third in value of the stockholders shall constitute a legal quorum for the transaction of all business. As both of these factions had present at each meeting more than one third of the stock of the company, so far as that is concerned, each had a quorum for the transaction of business. Which was the lawful meeting? Only one could act. Which was it?

" The evidence shows the existence of two factions—one,

COM. ex rel. LANGDON *v.* PATTERSON,. Appellant.  485

1893.]                    Charge of Court.

Mr. Patterson's, had agreed to sell a majority of the stock of
the corporation to a Mr. James Kerr. The other had agreed
to sell a majority of the stock to a Mr. S. P. Langdon. The
contract of sale of the first is not in evidence—the other is.
The rivalry between these two factions to obtain the control
of the organization of the company has given rise to this con-
troversy; and the evidence shows that on the 23d of February,
the day of the election of president and managers, there was a
feeling of intense partisanship, if not acrimony.

"Mr. Patterson had been previously elected president of the
stockholders' meeting, and as the meeting had been adjourned
it was claimed by his adherents that this did not cancel his
right to preside on their re-assembling. This, on the 23d of
February, when he took the chair, was most earnestly opposed
by Mr. Shellenberger and his attorneys. This opposition, if
they believed they were correct, they had a right to make, but
in a lawful manner. They claimed likewise that Mr. Patterson
was unfair and arbitrary in his rulings; that their rights were
not respected; that there was riotous conduct; that violence
was used by Mr. Patterson on one of their number, Mr. West-
ley; that a company policeman was there to overawe them and
intimidate them; that for half an hour they were unable to pro-
ceed with business, and could get no proper recognition and
protection from the chair; and with this belief, in the presence
of actual violence, they were at last compelled, for their own
protection and to have an election, to withdraw to another room
across the hall; that they then called a meeting of the direct-
ors, who elected tellers and then organized a stockholders' meet-
ing at which they elected a president and board, who are the
plaintiffs here; and that they invited the stockholders who re-
mained in the company's offices to go over and vote, which,
however, they declined to do.

"In reply to this, Mr. Patterson and his adherents claim that
at 10 o'clock he took his seat as president, though an effort had
been made to seat Mr. Shellenberger; that he was elected
president January 9th, and was lawfully continued by adjourn-
ment of the meeting; that the attorneys brought there by
Shellenberger began the disturbance by first contesting Mr.
Patterson's right to preside; that they persisted in various
ways, such as filing protests, loud and prolonged talking, in

486 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Charge of Court.                                    [158 Pa.

consuming time, and preventing the progress of business; that they sought by closing the folding doors between this inner room and the next room to prevent a joint or full meeting, and to conduct, in the offices of the company, a meeting of their own; that it is true Mr. Patterson stopped Mr. Westley from doing this, but only because he wanted a fair and open meeting and not through acts of violence nor to intimidate any one; that at the time the attorneys invited a withdrawal there was no disturbance, save what they made themselves, and that there was no show of force, no threats, no unfair treatment, but a patient waiting for them to become calm; that they themselves recognized the legality of the meeting by recognizing the chair and moving for the treasurer's stock list to vote by, and by other acts; that there was no necessity for leaving, and if they had a majority of the stock, outside of the 600 shares held by Patterson, it was their right and their duty to have remained there and made any legal objection to it they wished, and to have taken any other steps they were by law entitled to, and in a peaceable manner. They further say they sent word to Mr. Shellenberger's party to come over to vote, but they refused to come. We have not referred specially to the testimony on both sides of this question. It is too voluminous to do so; you have heard it all and will recollect it.

"Now, our attention is called here by the defendants to an allegation that the stock of the relators having been sold, or there having been an agreement to sell it, the relators had no right to vote it. The contract with Mr. Langdon has been read to you, and you will remember it. It is also to be observed that by its own terms it has become questionable whether it is any longer in force, because of a failure to make the weekly payments by Mr. Langdon. [However that may be, the stock, in point of fact, never was transferred; the legal title remained in the relators, and in the absence of any other stipulation they would be entitled to vote it, until transferred on the books of the company. It was also provided in the said agreement with Langdon that relators would execute and deliver to him, on the signing of the agreement, proxies enabling him to vote on them. The evidence shows that Mr. Langdon never received such proxies, and the power thus to vote on proxies was never granted to him. The language of this clause shows that the relators

COM. ex rel. LANGDON *v.* PATTERSON, Appellant. 487

1893.]                    .                   Charge of Court.

reserved, therefore, the right to vote on their own stock until they actually executed proxies to Langdon. This latter not having been done, the right remained in the relators to vote on their own stock on the 23d of February, 1893.] [9]

" With the right thus in relators and defendants both to vote on their stock on the 23d of February, we come back to the question of the election, or, as we have already asked, which was the lawful meeting? It was the duty of the stockholders on the 23d of February to meet, as required by the notice, at 10 o'clock A. M. at the company's offices. Before the hour had quite arrived Mr. Canan called the meeting to order and sought to have Mr. Shellenberger elected president. This, we think, was irregular. Mr. Patterson had been elected prior to the last adjournment and continued to be president. He had the right at 10 o'clock to call the meeting to order, if he was present to do so, and it seemed he was, after which the meeting could take such action as under the ordinary parliamentary usages it wished. At this point opposition and turbulence began and continued until the relators left the room. They say that the conduct of the chairman and the acts of violence and intimidation were of such a character that there could be no fair election, and, in order to have an election, they had to go to another room to elect the officers and managers.

" Now you will consider the whole testimony. We will not refer specifically to any of it. You will remember all that has been testified on this subject. [If it clearly appear that the fairness, purity and freedom of the election to be held could not have been secured because of the arbitrariness and violent conduct of Mr. Patterson, the chairman, and those who aided him ; and if it appear that the turbulence, force and violence of Mr. Patterson and his supporters were such as to intimidate men of ordinary firmness, then the relators were justifiable in withdrawing, and in notifying the meeting of their withdrawal and its cause, and their purpose to hold a meeting and elect the officers and managers.] [10]

" On the other hand, if there was no such unfair conduct, nor arbitrariness, nor violence, nor intimidation, then the relators were not justifiable in withdrawing and holding an election ; and any such election would be invalid and void. If they believed Mr. Patterson was not fair, it was their duty to

488 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Charge of Court—Points.       [158 Pa.

remain and question it there, by division, appeal or such other methods as are usual in such cases. Not every unfair act of a presiding officer will justify a withdrawal and the setting up of an independent meeting. The majority, on a motion, might have adjourned to another time or place; but it does not appear that there was any adjournment here. It was a withdrawal in the presence of alleged intimidation, and whether there was such intimidation as compelled their withdrawal is a question for you.

" In view, therefore, of all the evidence in the case on the one side or the other, and as we have instructed you, you will determine whether the case is with the plaintiffs or the defendants. [If there was such conduct and acts of intimidation as we have defined to you, on the part of Mr. Patterson and his friends, then your verdict should be for the plaintiffs.] [11] But if there was no such conduct and such acts on the part of Mr. Patterson and others with him, then your verdict should be for the defendants."

Plaintiffs' points were as follows:

" 1. That under the written agreement in evidence, dated January 5, 1893, between John Louden, William Louden, Andrew Kipple, W. L. Shellenberger, J. A. Canan, George S. Adams, S. J. Westley and W. S. Lee of the one part, and Samuel Langdon of the other part, the stock owned by the parties of the first part still remained in law, their property, until paid for and the certificates delivered to the said Langdon, and the said parties had the legal right to vote said stock at the annual meeting of the stockholders held on February 23, 1893." Affirmed. [1]

" 2. That the 600 shares of stock issued on February 23, 1893, by Frank G. Patterson to himself under the undisputed facts in this case, were illegally issued, and the said Frank G. Patterson had no right to vote the said 600 shares of stock at the annual meeting of the stockholders held on that day." Affirmed. [2]

" 3. That when the stockholders met at the office of the company February 23, 1893, at ten o'clock A. M., in pursuance of a call of the directors, the holders of the majority of the legal stock had the right to adjourn the meeting to another room, for any cause which they deemed sufficient, and to hold the annual

COM. ex rel. LANGDON *v.* PATTERSON, Appellant. 489

1893.]                    Points—Judgment.

meeting for the election of officers of the company at the place to which they had adjourned, upon giving notice to all stockholders present of said adjournment. *Answer :* The stockholders, or majority, had a right to adjourn the meeting to another place for sufficient cause, but if they had lawfully assembled under a legal call, it may be necessary that any such adjournment should be accomplished in a legal manner, which is usually by a motion properly made, seconded, put to the meeting, and carried by a lawful majority." [3]

Defendants' points were as follows:

" 1. John Louden, William Louden and others, having by their agreement with Samuel P. Langdon, dated January 5, 1893, sold their stock to Langdon, had no right to vote the stock referred to in their agreement at the election on February 23, 1893." Denied. [4]

" 2. F. G. Patterson had a right to vote at the meeting, on February 23, 1893, the 600 shares of stock, which he claimed to own, and for which he tendered to Westley, the treasurer, the check for $30,000." Denied. [5]

" 3. The withdrawal of John Louden and other stockholders from the meeting in the company's room, on February 23, 1893, was unjustifiable, and the meeting held by them in another room was irregular and illegal, and the election which they claimed to have held was illegal, and the officers they claimed to have elected are not the lawfully elected officers of the company. *Answer :* As the withdrawal of Louden and others is a question of fact for the jury, point as put is denied." [6]

" 4. The persons who were elected as president and directors, at the meeting in the rooms of the company, presided over by F. G. Patterson, are the lawfully elected officers of the company, and the verdict must be for the defendants. *Answer:* As this is a question of fact for the jury, under that portion of the evidence submitted to them, the point is denied." [7]

Verdict for plaintiffs. The court subsequently entered the following judgments:

" [Judgment is entered that F. G. Patterson, defendant in No. 78, March term, 1893, shall be ousted and altogether excluded from the office, franchise, privilege and power of president of the Altoona, Clearfield & Northern Railroad Company, and it is decreed that Samuel P. Langdon was on the 23d of

490 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Judgment—Arguments. [158 Pa.

February, 1893, duly elected president of the said corporation, and shall hold the possession of the said office until another shall be duly elected in his stead, according to law and the regulations of said corporation, and the defendant shall pay the costs of this proceeding."

"Judgment is entered that G. T. Bell, A. C. Shand, W. A. Ambrose, C. A. Wood, M. Scott Gwin, T. H. Wigton, W. W. Yon, Thomas H. Greevy, John K. Patterson, H. A. Gardner, H. J. Davis, J. H. Cheatham, defendants in No. 79, March term, 1893, shall be ousted and altogether excluded from the office, privilege and power as directors and managers of the Altoona, Clearfield & Northern Railroad Company, and it is decreed that William Louden, John Louden, John A. Canan, George S. Adams, W. S. Lee, S. J. Westley, Andrew Kipple, William Findley, M. H. Mackey, George F. Jackson and Charles Baltzell were on the 23d of February, 1893, duly elected directors and managers of the said corporation, and shall hold possession of the said office of directors each, until others shall be elected in their stead, according to law and the regulations of said corporation, and the defendants shall jointly pay the costs of this proceeding.] " [12]

*Errors assigned* were (1–11) instructions; (12) decrees; (13) order to try cases together; quoting instructions, decrees and order.

*D. J. Neff, Thomas H. Greevy* and *F. G. Patterson* with him, for appellants.—The subscription for 600 shares was in proper form. Whenever an intent to become a subscriber is manifested, the courts incline, without particular reference to formality, to hold that the contract of subscription subsists: Cook on Stock and Stockholders, 52; P. W. & B. R. R. v. Cowell, 28 Pa. 329; Colfax Hotel Co. v. Lyon, 29 N. W. R. 780, Bullock v. Falmouth, 3 S. W. R. 129; Cook on Stock and Stockholders, 8.

Mr. Patterson having subscribed for the stock, and having made every effort to pay for it, was entitled to vote the same at the election. He had an equitable title to it.

The 600 votes of Mr. Patterson, not having been challenged at the time of the election, cannot be inquired into now: Cook on Stock and Stockholders, 616.

COM. ex rel. LANGDON *v.* PATTERSON, Appellant. 491

1893.]                          Arguments.

Even without Mr. Patterson's 600 shares, defendants had a majority of all the legal votes : Election of Directors of Chenango M. Ins. Co., 19 Wend. 635 ; Wheeler v. Millar, 90 N. Y. 353 ; Schoharie V. R. R. Case, 12 Abbott's Pr. Rep., N. S. 394.

If we assume that Mr. Patterson could not legally vote the 600 shares, and that the transfer to Langdon did not invalidate the votes cast by relators, still, the persons elected at the meeting presided over by Mr. Patterson, having a majority of all the shares voted at that meeting, and that being a regular and legally organized meeting, they were the legally elected officers.

An adjourned meeting is but a continuation of the meeting adjourned : Taylor on Corporations, 601.

The Langdon stockholders had participated in this meeting and recognized its legality. They could not withdraw from it and hold a lawful meeting elsewhere : Faulkner v. Edwards, 12 Lawyers' Rep. An. 781.

Those who voluntarily absent themselves from a meeting duly called for an election must recognize the validity of the election regularly made by those who do attend. Such absentees present no ground for relief from their misfortunes or their folly : Gowen's Ap., 10 W. N. 93.

It is a well settled rule in corporations having a capital stock divided into shares, that a majority of the votes cast at any election shall elect : Cook on Stockholders, 607 ; Granger v. Grubb, 7 Phila. 356.

A casual affray will not affect the validity of an election : Paine on Elections, § 467 ; McCrary on Elections, § 515, p. 345 ; also § 523, p. 351.

All the directors are entitled to notice of a directors' meeting : Taylor on Corporations, 260 ; Kersey Oil Co. v. Oil Creek & All. R. R., 12 Phila. 375.

A meeting held at a different place from the one designated in the notice is irregular : Taylor on Corporations, 574.

*H. M. Baldrige, Martin Bell* and *John H. Orvis* with him, for appellees.—The subscription of 600 shares was invalid : Act of 1876, P. L. 135 ; Act of May 3, 1887, §§ 3, 5, P. L. 94.

Colfax Hotel Company v. Lyon, 29 N. W. R. 780 (Iowa), cited by appellants, shows that the subscription was at a corpo-

492 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Arguments. [158 Pa.

rate meeting; the person directed the secretary to subscribe for him, which he did, on a sheet of paper, and these facts were recited on the corporate records.

A contract of subscription must be in writing, and cannot be established by parol evidence: Pittsburgh & Steubenville R. R. v. Gazzman, 32 Pa. 340; Pierce on Railroads, 25.

It was a fraud on other stockholders of the company for Patterson to attempt to procure this stock: Reese v. Bank of Montgomery Co., 31 Pa. 78.

It is claimed that as the 600 votes were not challenged they cannot be inquired into now, but the evidence shows that when the voting took place appellees were not present to object.

Under the general authorities, independent of our statute, the right to vote depends on the record title, not on actual ownership: Pierce on Railroads, 24; People v. Robinson, 64 Cal. 373; Act of May 7, 1889, § 1, P. L. 102.

The agreement provided they were to give Langdon proxies to vote. No person can vote by proxy if not in person. If Langdon had voted by proxy, it was their vote and not his. Right to vote is determined by the agreement of parties: Shelmerdine v. Welsh, 47 Leg. Int. 26; Com. v. Dalzell, 152 Pa. 217; Aultman's Ap., 98 Pa. 505.

In Fulkner v. Edwards, 12 Lawyers' Rep. An. 781, the court said, this appeal must be decided as we determine which of two persons had the right to vote 546 shares of the stock. The total number of shares of stock in the corporation were 570.

In Gowen's Appeal, 10 W. N. 93, cited by appellants, Mr. Gowen held proxies for a majority of the stock, and voluntarily remained away, believing a majority of all the stock was required to elect, and he wished to prevent a change in the management. The circumstances bear no analogy to this case.

An election is legal, although in an emergency there was a departure from ordinary modes of procedure. An election may be declared void for the rejection of legal and the counting of illegal votes, which changed its result; and for substantial irregularities, surprise and fraud: Pierce on Railroads, 26; Wood's Field on Corporations, 2d ed. 212; Desdoity's Case, 1 Wend. 96.

The judgment was warranted by the verdict: Act of April 13, 1840, P. L. 323; Claghorn v. Cullen, 13 Pa. 145.

COM. ex rel. LANGDON *v.* PATTERSON, Appellant. 493

1893.]          Arguments—Opinion of the Court.

The trial of both issues together was entirely discretionary with the trial judge: Act of June 14, 1836, P. L. 639.

## COM. EX REL. LANGDON V. PATTERSON.

OPINION BY MR. JUSTICE MITCHELL, November 13, 1893:

The evidence shows that the disorder at the meeting on February 23, was begun by the relator and his friends in the attempt to substitute a chairman of their own party for Mr. Patterson, who having been chosen at the original meeting was entitled to call the adjourned meeting to order, and to continue to preside unless superseded in some orderly and recognized parliamentary manner.

The subsequent disorder was at least as much the fault of the relator's party as of the appellant, and, such as it was, was practically over before the former started to withdraw. In fact the conclusion is irresistible from the evidence that the withdrawal was not in good faith to escape disorder, but a cover for carrying out a preconceived scheme to organize and run the meeting in their own interests. The call to withdraw was not to all stockholders, or even to all desiring an orderly and legal election, but to the party of the relator, and was so understood, both by themselves and the others. It was without any justification in law, and there was no sufficient evidence to submit to the jury in that behalf. The subsequent invitation to the others to come over and vote in a meeting thus illegally convened and in possession of the seceders was ineffectual to cure the radical defect of organization. All its acts were illegal, and mere nullities as against the other stockholders. The jury should have been directed to find for the defendants.

Upon the computation of votes, it does not appear that appellant Patterson has made out his claim to the six hundred shares of stock in such form as to entitle him to vote upon them. This number must therefore be deducted from the sum total of appellant's vote, leaving him 348.

But on the other hand there were cast for the relator a number of votes that were clearly not admissible. A few were cast by persons holding proxies from owners of stock who were present and voting in person at the other meeting. But the principal contention is over the effect of the agreement of Jan-

494 COM. ex rel. LANGDON *v.* PATTERSON, Appellant.

Opinion of the Court. [158 Pa.

uary 5, 1893, between Langdon and certain stockholders for the sale of their stock. This was a contract of present sale, and the vendors parted with possession. It is true the stock was delivered to a third party to be held in escrow, and the vendors retained a contingent right to resume title on Langdon's failure to comply with the terms of the sale, but the whole present beneficial interest of the vendors was parted with, and no act of their own could restore it. They parted expressly with the right to vote in the interim while the contract was executory, by agreeing that such right should be in Langdon. They were not present owners in any such sense as to entitle them to vote. Whether Langdon could have voted the stock thus acquired within sixty days of the election, we need not consider, as he made no offer to do so.

The act of May 7, 1889, P. L. 102, does not bear materially on this case. That act, as was held in Com. ex rel. v. Dalzell, 152 Pa. 217, so far as it is more than declaratory of the common law, is "a directory establishment of the prima facies in the cases enumerated therein, for the guidance of the election officers, but not intended to interfere with the privileges of individual owners, or the by-laws of corporations, and certainly not to take away or settle finally any legal rights." Prima facie the right to vote accompanies the legal title, but when the title is divided, and an equity exists, as between pledgor and pledgee, trustee and cestui que trust, or, as in the present case, between vendor and a vendee with a title inchoate until payment, the right to vote is subject to the agreement of the parties. This is the rule not only of the common law, but also of the act of 1889. Our attention has not been called to any by-law of this corporation which in any way affects this result.

The right to vote on the stock sold by the agreement of January 5, 1893, was, as already said, expressly vested in Langdon, and therefore, even if the vendors had offered to vote it at the regular and legal meeting, they could not have been permitted to do so. Throwing out these illegal votes, the appellee would have had no claim to a majority even if the vote for him had been cast at the regular meeting.

The judgment of ouster is reversed and the appellant is reinstated in his office of president. Costs to be paid by appellee.

COM. ex rel. LANGDON v. PATTERSON, Appellant. 495

1893.]                    Opinion of the Court.

COM. EX REL. LOUDEN ET AL. V. BELL ET AL.

OPINION BY MR. JUSTICE MITCHELL, November 13, 1893 :

This case was argued with Com. ex rel. Langdon v. Patterson, and is governed by the facts and law set forth in the opinion filed herewith in that case.

Judgment of ouster reversed and appellants reinstated in their office of director. Costs to be paid by appellees.