MENDEL LURIE, Suing on Behalf of GENERAL REFRACTORIES COMPANY, Respondent v. JACOB M. KAPLAN, Appellant, et al., Defendant.

First Department, December 10, 1968.

*Spencer Pinkham* of counsel (*Colton & Pinkham,* attorneys), for appellant.

*Charles M. Berkson* for respondent.

RABIN, J.  In this action, the plaintiff suing derivatively on behalf of the General Refractories Company, a Pennsylvania corporation (hereinafter referred to as General), charges the defendant with having sold corporate votes in violation of section 504 of the Pennsylvania Business Corporation Law.  (Now Pa. Stat., tit. 15, § 1504 [1967].)

He seeks to recover, on behalf of the corporation, the sum of $532,875 which he alleges "is a corporate asset and is equitably the property of" the corporation by reason of it being a "premium  *  *  *  exacted in violation of law through the sale of a corporate vote".  The premium referred to represents the difference between the market price of General's stock and the higher price received for it as the result of a sale by the defendant of 101,500 shares of that stock.

This action is not the same as was involved in *Diamond* v. *Oreamuno* (29 A D 2d 285), or in *Securities & Exch. Comm.* v. *Texas Gulf Sulphur Co.* (401 F. 2d 833).  The complaint does not allege that the defendant was either a director or officer of the corporation, nor does it allege that he was an insider or had inside information, or that he was a fiduciary of any kind, or that he either had or sold control of the corporation.  The cause of action asserted is grounded simply upon an alleged violation of the Pennsylvania statute prohibiting the sale of a corporate vote. It is that which the plaintiff must prove in order to make out a case. He may not, in this case, recover for a breach of any claimed fiduciary relationship if, indeed, there was one, or for the defendant having profited through the advantage of inside information, if indeed he did.  Whether he could establish a case on any of these grounds is a different question entirely and is not before us.

The defendant, in this consolidated appeal, appeals from two orders.  The first denied his motion to dismiss the complaint for failure to state a cause of action, and the second denied his motion for summary judgment.

In denying the first motion the court did not really pass upon the sufficiency of the complaint.  After stating the accepted principle that "every beneficial inference is given to the complaint," the court said that the complaint "discloses that from the very nature of the transaction, the facts relating thereto are within the exclusive knowledge of the movants  *  *  *  under

circumstances that plaintiff would have no actual knowledge thereof. The plaintiff has established that facts essential to justify opposition to this motion may exist but cannot be stated until disclosure is had in this action.'' We observe that a complaint that is insufficient cannot be held to state a cause of action because, though not alleged, '' facts   *   *   *   may exist '' to enable the plaintiff to write a good complaint. Be that as it may, the court denied the motion to dismiss '' without prejudice to the right to renew the motion after the plaintiff has completed pre-trial disclosure herein.''

Subsequently, disclosure proceedings were had. The defendant was examined before trial and produced such documents and records as requested by the plaintiff. It was after such disclosure proceedings, opening the door for the plaintiff to obtain all the information that he claimed he did not have at the time the motion to dismiss was made, that the defendant made its motion for summary judgment, which the court denied.

We first consider the claim that the complaint fails to set forth a cause of action. As indicated, the plaintiff must allege sufficient facts which point to a violation of the Pennsylvania statute prohibiting the sale of a corporate vote.

It is alleged in the complaint that General issued a proxy statement dated March 22, 1966. That proxy statement was aimed at soliciting proxies for a meeting to be held on April 22, 1966 to obtain approval of a proposal to acquire the assets and liabilities of the Mining and Mineral Products Division of the Great Lakes Carbon Corporation (hereinafter referred to as Great Lakes). The proxy statement revealed that Great Lakes had entered into an agreement with an individual shareholder of General (referring to defendant Kaplan) to purchase at a price of $28 per share, 101,500 shares of General's capital stock for payment and delivery on September 30, 1966. The agreement further provided for the delivery of irrevocable proxies to the buyer, giving it the right to vote such shares at any and all meetings prior to September 30, 1966. The complaint further states that the opening price of General's stock on the New York Stock Exchange on March 22, 1966 was $22.75 per share, or $5.25 below the contract price and that, therefore, the defendant Kaplan received a premium of $532,875 above the market price.

After pleading section 504 of the Pennsylvania Business Corporation Law, which forbids the sale of a corporate vote, the plaintiff, in the only place in the complaint where he attempts to plead wrongdoing on the part of the defendant, alleges as follows: '' 15. The said premium of $532,875, exacted in violation

of law through the sale of a corporate vote, is a corporate asset and is equitably the property of General.''

It is to be noted that the plaintiff does not directly charge the sale of a corporate vote. He alleges it rather obliquely — merely by way of a conclusory assumption. However, for the purpose of construing the complaint, we shall consider it a direct charge that a vote had been sold.

From the facts alleged in the complaint, can such a conclusion be drawn? There are but three operative facts alleged: 1. That the block of shares was sold at a price above the market price. 2. That the agreement of sale provided for payment and delivery of the stock, to be made in September, 1966 (about six months after the date of the issuance of the proxy statement). 3. That the seller was required to deliver an irrevocable proxy to the buyer enabling it to vote the shares at all meetings prior to the date when the stock was to be delivered.

From none of these statements, taken separately, may we draw a conclusion that a vote was sold. 1. An owner of stock may sell it, even above the market price. 2. There can be no criticism if the arrangement of sale provides that payment and delivery be deferred. 3. The delivery of an irrevocable proxy to the buyer, enabling it to vote prior to the delivery of the stock, does not constitute the sale of a vote within the meaning of section 504 of the Pennsylvania Business Corporation Law. That section permits the delivery of an irrevocable proxy where it is coupled with an interest. It provides as follows: '' A proxy, unless coupled with an interest, shall be revocable at will ''. It is quite apparent then that where a proxy is coupled with an interest, it may be an irrevocable one. Consequently, the very section that prohibits the sale of a vote, allowing delivery of an irrevocable proxy, which is coupled with an interest, must be deemed to sanction delivery of such proxy upon a sale of stock, and such delivery cannot be deemed as a sale of a vote within the meaning of that section.

It is interesting to note that section 609 of the New York Business Corporation Law, entitled '' Proxies '', which, like the Pennsylvania law, prohibits the sale of a vote, is of similar effect, and also allows the delivery of an irrevocable '' proxy '' when given to '' a person who has purchased or agreed to purchase the shares ''. Here we have more than an agreement to purchase. We have an actual sale.

Even in the absence of statute, the courts have held that a stockholder may give an irrevocable proxy to a buyer of the stock. In *Commonwealth ex rel. Langdon* v. *Patterson* (158 Pa. 476 [1893]) the court held proxies to be valid where the owner

of stock agreed to sell it, and the stock was deposited in escrow pending receipt of the last payment. The court stated as follows (p. 494): " This was a contract of present sale, and the vendors parted with possession. It is true the stock was delivered to a third party to be held in escrow, and the vendors retained a contingent right to resume title on Langdon's failure to comply with the terms of the sale, but the whole present beneficial interest of the vendors was parted with, and no act of their own could restore it. They parted expressly with the right to vote in the interim while the contract was executory, by agreeing that such right should be in Langdon. They were not present owners in any such sense as to entitle them to vote." And " Prima facie the right to vote accompanies the legal title, but when the title is divided, and an equity exists, as between pledgor and pledgee, trustee and cestui que trust, or, as in the present case, between vendor and a vendee with title inchoate until payment, the right to vote is subject to the agreement of the parties."

Even considering the three operative statements together, we may not reach a conclusion that there was a sale of a corporate vote. It might be quite different if the agreement had provided for a conditional sale in the nature of a condition precedent, or a sale that could be rescinded upon the happening of a condition subsequent. Such circumstances perhaps would make a stronger case for calling it a sale of a corporate vote. Here, however, the pleaded sale was absolute, unconditional and binding on both parties. It might very well be that the object of Great Lakes in entering into this agreement was to obtain additional votes for use in the forthcoming meeting. That, of course, it had a right to do. However, the object of Great Lakes in purchasing does not convert into a sale of votes this sale of stock.

Section 504 of the Pennsylvania Business Corporation Law was not meant to outlaw a transaction such as here alleged. The proxy delivered under this agreement was given in connection with the sale of stock, thereby giving the purchaser an interest — an interest unconditional and irrevocable. The transaction does not come within the letter of or the spirit of section 504 of the Pennsylvania Business Corporation Law. That statute clearly relates to the sale of votes apart from the sale of stock.

Giving the plaintiff the benefit of every proper inference that may be drawn from the facts alleged, it must be held that the complaint does not make out a good cause of action.

Nor are the affidavits submitted in connection with these motions of any assistance to the plaintiff in his attempt to estab-

lish a case. Indeed, accepting the facts set forth in those affidavits, we find that no triable issue has been presented.

We briefly summarize those facts presented in the plaintiff's affidavits that do not appear in the complaint.

It appears that the defendant Kaplan originally bought his General stock upon the advice of the president of the Susquehanna Corporation. That corporation owned 14% of the stock of General and was its largest stockholder. Kaplan, eventually, purchased approximately 3% of the stock of General, all of which was sold under the agreement above discussed.

Prior to March 22, 1966 (the date when the sale of defendant's stock was consummated), General contracted, subject to approval of its stockholders, to acquire certain assets of Great Lakes in exchange for General's stock. Public announcement of such proposal was made in January of 1966. It appears, further, that the president of the Susquehanna Corporation informed the defendant that an offer had been made through Lehman Bros., acting for Great Lakes, to purchase the Susquehanna shares for $28 per share, but that the offer was refused. The defendant Kaplan thereafter made inquiry through his brother-in-law, a senior partner of Lehman Bros., and was told, in effect, that no firm offer of $28 per share was made to Susquehanna, but that Great Lakes would pay $28 per share to the defendant for his stock. That offer was accepted by the defendant and, in consequence, the sale here complained of was made. It is to be noted that the public announcement of the proposed purchase of the Great Lakes property by General was made long before the transaction here complained of was consummated and, further, that the proxy statement issued by General fully informed the stockholders of such sale.

Additional facts, not set forth in the complaint, but contained in the affidavits, indicate that while delivery of the stock was not to be made until September of 1966, the agreement required that the stock be placed in escrow, pending the consummation of the transaction. That was done. The affidavits further indicate that pending payment and final delivery of the stock, dividends were to be retained by the defendant. It would seem that the retention of these dividends by the defendant is not a factor to be taken into consideration in arriving at our determination. Payment having been deferred by agreement of the parties, the defendant would be entitled to either interest on the amount withheld or to the dividends.

It is significant that Susquehanna, alleged to be an insider, voted its stock against approval of the transaction between

General and Great Lakes. The proposal was carried with a margin of 188,312 votes more than was necessary to win approval.

These are all of the additional facts that the plaintiff was able to gather after having been given an opportunity to obtain the information which he said he lacked at the time the original motion to dismiss the complaint was made. Rather than pointing to the sale of votes, they establish clearly a bona fide sale of stock—firm and unconditional, accompanied with a parting of possession. These facts do not allow for any other conclusion. Indeed, if any other conclusion were reached it would be one without a rational basis. For the reasons given above, such sale permits of the giving to the purchaser of an irrevocable proxy. Section 504 of the Pennsylvania Business Corporation Law not only does not prohibit it, but on the contrary the giving of such proxy has its sanction. Accordingly, the plaintiff cannot prevail.

The plaintiff attempts to bolster its position by inferring that the sale was improper because it was made by an " insider " or as the result of information obtained from an " insider." Furthermore, the plaintiff characterizes this sale of 3% of the corporate stock as a sale of control and, for some reason, asserts that such sale is improper. We need not concern ourselves with the merit or the lack of merit of these contentions. This suit is not brought upon either of such theories. As already pointed out, it is brought solely for an alleged violation of the Pennsylvania law, prohibiting the sale of votes. That is the only charge, and it is that charge that the defendant is called upon to meet in this case, and no other.

The defendant asserts, additionally, that even if the transaction could be deemed to constitute a violation of the statute against the sale of votes, it does not give rise to a cause of action on behalf of the corporation for money damages. Holding as we do, that the complaint does not state a cause of action, and that the additional affidavits submitted do not present a triable issue, we need not consider, nor do we consider, this position advanced by the defendant.

Accordingly, the order denying summary judgment to the defendant should be reversed and the defendant's motion for summary judgment dismissing the complaint should be granted with costs and disbursements to the appellant, without prejudice to the plaintiff proceeding on any different cause of action as he may be advised. In view of this disposition the appeal from the order denying the defendant's motion to dismiss the complaint under CPLR 3211 becomes academic and is dismissed without costs or disbursements.

100

McGIVERN, J. (dissenting). I do not believe the complaint should be dismissed or that summary judgment should be awarded the defendant.

We do not have a mere sale of stock in the simplistic way that the majority views the transaction in suit. From the pleadings, the affidavits and the examinations a darker and far more complicated situation emerges. The protagonist, the defendant Kaplan, came into General Refractories, a publicly held corporation, at the behest of Susquehanna and was an erstwhile companion-in-arms of Mr. Korholz, chairman of the Susquehanna board. Indeed, it was feared that as allies they would attempt to take over General. However, the defendant putting together information derived from Susquehanna, an insider, and from his own brother-in-law, a partner in Lehman Brothers, a Great Lakes agent, the defendant switched his allegiance and became party to the Great Lakes sale, making a profit of $532,875. In my view, the defendant's deft use of this information, to which he was privy only because of the unique corporate position he enjoyed, information well beyond the ken of his fellow stockholders, certainly beyond the public domain, in one stroke resulted in a premium of over half a million dollars. The information was crucial, that Great Lakes was willing to pay him a half million dollars above the market price of his stock to assure Great Lakes of enough reserve to put over the deal with General. It is at least an arguable question worthy of the trial process, that the defendant, because of the unusuality of his corporate relationship, to his own instant profit, made use of material and significant information of an extraordinary character but not available to his fellow stockholders or to the general public.

Since the disposition of Special Term (December 22, 1967), the law in this area has moved on apace. (See *Diamond* v. *Oreamuno*, 29 A D 2d 285 [Feb. 20, 1968] and *Securities & Exch. Comm.* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833 [2d Cir., Aug. 13, 1968].) Believing, as I do, that the instant case is within the penumbra of both the *Diamond* and *Texas Gulf* decisions, the plaintiff is entitled to a plenary consideration of his case. There certainly is here present a doubt and an issue large enough to prevent summary judgment. (*Sillman* v. *Twentieth Century-Fox, 3* N Y 2d 395, 404.)

As for the complaint, it is thin, a sort of a " bare bones " complaint. But it will do. It puts the defendant on notice that the transaction is under fire, it is challenged. And, on the enlarged record before us, the defendant cannot possibly be prejudiced or misled either as to identity of the transaction or the occurrences sought to be litigated. (*Foley* v. *D'Agostino, 21* A D 2d

60; *Lane* v. *Mercury Record Corp.*, 21 A D 2d 602; *Moller* v. *Board of Educ. of the City of Albany*, 30 A D 2d 998.)

Accordingly, in my view, the Special Term orders were correct in both instances, the refusal to dismiss, the refusal to grant summary judgment, and both orders should be affirmed.

STEVENS, J. P., EAGER and CAPOZZOLI, JJ., concur with RABIN, J.; McGIVERN, J., dissents in opinion.

Order entered on April 5, 1968, reversed, on the law, with $50 costs and disbursements to appellant, and defendant's motion for summary judgment dismissing the complaint granted, with $10 costs, without prejudice to plaintiff proceeding on any different cause of action as he may be advised, and the Clerk directed to enter judgment in favor of defendant-appellant dismissing the complaint, with costs.

Appeal from order entered on December 26, 1967, becomes academic in view of the decision on the appeal from the order entered April 5, 1968 and dismissed without costs or disbursements.