**CAREY, Edward,**

v.

**PENNSYLVANIA ENTERPRISES, INC.; Obara, Frank J., Jr.; Barbera, Michael J.; Ferrucci, Mark A.**

**Appeal of Edward M. CAREY.**

No. 88–5968.

United States Court of Appeals, Third Circuit.

Argued April 27, 1989.

Decided May 31, 1989.

H. Robert Fiebach, David M. Doret (Argued), Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., Bour, Gallagher, Foley, Cognette, Cowley & Douglass, Scranton, Pa., Gadsby & Hannah, Boston, Mass., for appellant.

Richard Z. Freemann, Jr. (Argued), Walter M. Einhorn, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellee.

Before SEITZ, SLOVITER and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This is a diversity case involving a dispute between a Pennsylvania corporation, Pennsylvania Enterprises, Inc. (PEI), and one of its shareholders, the resolution of which is governed by Pennsylvania law. The shareholder, Edward Carey, challenged the validity of a corporate election in which his position opposing the split of PEI's stock as proposed by management lost by a narrow margin. Thus, he commenced this action on October 31, 1988, in the district court to enjoin implementation of the result of the election. After a trial, the district court in a memorandum opinion upheld the management's position and on December 8, 1988, entered a final judgment denying Carey an injunction. Carey appeals from that order.

Carey presents several arguments to demonstrate that some of the votes counted in favor of the PEI management should have been disallowed, and other arguments that additional votes in his favor should have been counted. We conclude that Carey is correct in his assertion that the Dividend Reinvestment Plan (DRIP) votes, *i.e.*, the votes of additional shares acquired by PEI shareholders by reinvestment of cash dividends, without which there was insufficient support to approve the stock split, were improperly counted. Thus, we will reverse the judgment of the district court without addressing any of Carey's other contentions, since their disposition could not change our result.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Carey, a citizen of New York, owns or owned approximately 109,000 shares of PEI, a publicly held Pennsylvania corporation with its principal place of business in Wilkes–Barre, Pennsylvania. In 1987 and 1988 Carey, through a corporation he controlled, made several unsuccessful offers to buy PEI. Thereafter, as the district court found:

> [o]n or about September 9, 1988, PEI announced to its shareholders that it intended to convene a special meeting of shareholders to be held on October 12, 1988 [in Wilkes–Barre] to vote upon a proposal to amend the Articles of Incorporation of PEI by authorizing an increase in the number of authorized shares of common stock from 5 million to 10 million shares; to reduce the stated value of said shares from $10 per share to $5 per share; and to authorize a split in the common stock on a 2 shares for 1 share basis.

*Carey v. Pennsylvania Enterprises, Inc.*, No. 88–1777, slip op. at 5–6 (M.D.Pa. Dec. 8, 1988). Carey opposed this proposal, as he apparently considered that it would result in a wider distribution of PEI stock, making it more difficult for him to acquire the company.

Adoption of the amendment required the approval of the voters representing a majority of PEI's outstanding shares of stock, since there was no provision in PEI's articles of incorporation requiring a super-majority. *See* Pa. Stat. Ann. tit. 15, § 1805 (Purdon 1988 Supp.). Thus, votes representing 1,350,171 of the 2,700,341 outstanding shares were required for the proposal to succeed.

The board of directors of PEI fixed September 2, 1988, as the record date for the meeting; thus the owner of each share as recorded on PEI's books at the close of business on that date was entitled to vote on the proposal at the October 12, 1988, meeting. *See* Pa.Stat.Ann. tit. 15, § 1509

---

1. *See Bradford–White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1155 (3d Cir.1989). In this regard we point out that notwithstanding the fact that certain of Carey's challenges were sustained and one by PEI was rejected, PEI does not advance as an alternative ground for affirmance that the judges of election rejected sufficient valid votes cast in favor of the proposal to overcome the invalidation of the DRIP votes. We also indicate that while our decision is limited to one issue, certain of the other contentions by Carey raise serious questions, and thus we do not imply that we do or do not see merit in them.

(Purdon 1967). The parties do not dispute the district court's finding that:

> [a]s of the record date, 79,118 shares of the Defendant's stock were issued and outstanding under the Dividend Rein-vestment Plan (DRIP). Manufacturer's Hanover Trust was the administrator of this plan and the shares were held by Loriot & Co. and Cede & Co., as nomi-nees of the administrator. Loriot & Co. and Cede & Co. were listed on Defendant PEI's documents as the record holders of these shares. *Carey,* slip op. at 13.

Nor do the parties dispute that one of the provisions of the DRIP plan addressed who would be entitled to vote the shares in the plan as follows:

> 21. *Will a participant be able to vote the shares held in his account under the Plan?*
>
> Yes, all of the participant's full shares —those registered in the name and those credited to the account of the participant under the Plan—will be included on one proxy mailed to the participant in the regular manner.

App. at 796 (emphasis in original).

Solicitation of proxies by PEI in support of the amendment began on or about September 9, 1988. As explained by PEI, "PEI's proxy form ... included both the record and DRIP shares held by each shareholder." Brief of Appellee at 20.[2] Inasmuch as in almost every instance the owner of DRIP shares was also a record owner of other shares, a proxy distribution to the record owners covered the majority of the DRIP shares. After requesting a shareholder list from PEI on September 14, 1988, and receiving it approximately one week later, Carey on or about October 3, 1988, also began soliciting proxies in oppo-sition to the management proposal from PEI shareholders. It is undisputed that since the shareholders' list showed Loriot

and Cede as the record owners of the DRIP shares Carey was aware that they were the owners.[3] It is also not disputed, as found by the district court, that "[p]roxies for [the DRIP] shares ... were issued directly to the beneficial holders," *Carey,* slip op. at 13, rather than to Cede and Loriot and thus to the extent that the DRIP owners were record owners Carey's proxy forms should have reached them. However, PEI admits that Carey's proxy form did not state the number of DRIP shares owned by the shareholder. Brief of Appellee at 20. We also note that both management and Carey used professional firms to assist in the solicitation of proxies.

As authorized by the Pennsylvania Busi-ness Corporation Law.Pa.Stat.Ann. tit. 15, § 1512 (Purdon 1967), PEI appointed as judges of the election three employees of the Corporation Trust Co. of Wilmington, Delaware: Frank J. Obara, Jr., Michael J. Barbera, and Mark A. Ferrucci. These three individuals were charged to oversee the conduct of the meeting and determine the results of the voting.

It is uncontested that the October 12, 1988, meeting began at approximately 10:00 a.m., and that the beneficial holders of DRIP shares cast their votes, which were counted by the judges of election. At approximately 11:09 a.m. the polls were declared closed by the chairman of the meeting, the president of PEI, with no ob-jection being made by anyone present.[4] The meeting was then adjourned until No-vember 22, 1988, when the certified results of the election were to be announced.[5]

After the judges collected the votes cast, representatives of Carey and PEI manage-ment were permitted, from October 25 through October 27, 1988, to review the proxies and tally sheets used in the voting. The judges held hearings on October 28,

---

2. This was because the DRIP plan provided that the participants would be able to vote their DRIP shares.

3. We do not suggest that Carey was unaware of their status under the DRIP plan.

4. Carey asserts that there had been no prior announcement of when the polls would be

closed. The district court, however, found that "the chairman announced that the polls would close at a specific time." *Carey,* slip op. at 6. Although there is contrary evidence in the record we need not resolve this issue on appeal.

5. We were informed at oral argument that this meeting had not been held.

1988, during which they ruled on challenges to votes and proxies by both Carey and the PEI management. Based on the rulings, it appeared that of the 2,700,341 outstanding shares, 2,226,147 had been counted and credited, and that the proposal had passed with 1,373,968 votes in favor, 829, 399 against, and with 28,780 regarded as abstentions. Since the proposal required 1,350,171 shares in favor, it seemed that PEI management had received support from 23,797 shares more than needed.

Carey contends that in calculating the results, the judges made several erroneous decisions. To affect the outcome of the election these decisions individually or in combination need only result in shifting a net 23,798 shares away from approval of the amendment.

One of Carey's challenges was that although the recordholders of the DRIP shares were Loriot and Cede, for voting purposes the judges wrongfully attributed these shares to their beneficial owners. This challenge was crucial inasmuch as invalidation of the affirmative DRIP votes would have reduced the affirmative vote to less than a majority of the outstanding stock in PEI. The election judges resolved this challenge against Carey, ruling:

> It is obvious to the judges that Loriot & Co., holder of DR[I]P shares passed the right to vote shares to the participants in the Plan. This is evidenced by the inclusion of these shares in the management proxy, further evidenced by past practice

of Loriot in all cases where it held such shares, as well as publication of this practice in public documents (not submitted to the judges, but known to them). The judges credited both management and opposition proxies with the appropriate DR[I]P shares due them. To disenfranchise a whole category of holder due to the lack of a formal appointment would be unfair, in our opinion. App. at 357.[6]

Carey also made four other objections. First, he claimed that the judges refused to count 160,865 votes [7] received after the closing of the polls. Second, the judges accepted as valid, management proxy cards consisting of the actual telecopied reverse side of each proxy card, containing the shareholder's name, signature and vote, stapled to a photostated obverse side, containing the appointment language. Third, the judges counted all the shares of shareholders who voted by proxy telegrams by calling an 800 number, even though some of these telegrams did not include the number of shares owned. Fourth, although Carey's proxy materials were never delivered to the beneficial owners [8] of PEI's Employee Stock Option Plan (ESOP), the judges counted the proxies for these shares, all in favor of the management proposal, submitted during September, 1988, by Cede & Co., the record owner/nominee for Wall Street Trust, through which the ESOP shares were held by the

---

**6.** The election judges resolved each challenge in an individual document referred to as a "Report, Determination, Certificate of Fact." We are uncertain why this report did not refer to Cede as an owner of record but we do not regard the omission as significant as the district court considered Carey's challenges as embracing both the Loriot and Cede shares and PEI does not suggest that Carey has not preserved his right to challenge the votes by the beneficial owners of the Cede shares. We do note that most of the DRIP shares were held in the name of Loriot, not Cede.

**7.** This large number of uncounted votes is attributable to the fact that shareholders were capable of "reversing" their earlier votes. *See generally* 5 C. Keating & J. Reinholtz, Fletcher Cyclopedia of the Law of Private Corporations § 2017, at 119 (rev. vol. 1987) (stating that in

the absence of any controlling bylaw, agreement or other binding provision concerning earlier closing of the polls, "a stockholder ... may change his or her vote at any time before the result is finally announced"). Consequently, the total number of votes and reversals could exceed the number of outstanding shares. Of the uncounted votes, the district court found that 47,014 were reversals.

A witness for Carey indicated in his trial testimony that of the late proxy votes, 131,893 were against the proposal, 24,634 were for the proposal, and that there were 4,338 abstentions. *Carey,* slip op. at 8 n. 4.

**8.** Carey's proxy solicitor had submitted proxy materials to the record shareholders, Cede & Co., and Bow & Co., who forwarded those materials to the trustee but the materials were not further forwarded to the beneficial owners.

ESOP trustee, First Eastern Bank.[9]

On October 31, 1988, Carey filed a complaint in the district court naming PEI and the three election judges as defendants. The complaint, asserting the five foregoing irregularities, sought to enjoin both the certification of the results of the vote and the implementation of the proposal.[10] Carey also filed a motion for a preliminary injunction and an application for a temporary restraining order. The district court on the same day restrained the judges from issuing and certifying the voting results.

By its order of November 2, 1988, the district court dissolved the temporary restraining order, and scheduled a hearing on Carey's motion for a preliminary injunction. On November 2, 1988, the judges certified the results of the shareholders' vote.[11] With the consent of the parties, the hearing on the request for a preliminary injunction was converted into a trial on the merits to determine whether Carey should be granted permanent injunctive relief. *See* Fed.R.Civ.P. 65(a)(2).

At trial Carey presented testimony that the "disallowance of the DRIP shares would have the affect of reversing 52,255 affirmative votes." App. at 181. Inasmuch as the number of DRIP shares voted in favor of PEI management's proposal exceeds the 23,798 margin, the proposal would have been defeated in the absence of these votes. PEI does not contend that if the votes of the DRIP shares are disallowed a majority of the outstanding shares would have favored the proposal.

■ On December 8, 1988, the district court issued an order denying injunctive relief and in an accompanying opinion rejected each of Carey's five arguments. The district court found, among other things, that although the DRIP votes were, notwithstanding Pa.Stat.Ann. tit. 15, § 1509 (Purdon 1967), cast by the beneficial owners rather than the record owners, "this action of the judges [was not] in 'direct violation of Pennsylvania law' as alleged by the Plaintiff, since the basic duty of the judges of election under the ... law is to be as reasonable as possible and to avoid disenfranchisement on mere technicalities." *Carey*, slip op. at 14. This appeal followed. Inasmuch as the district court ruling was a final judgment on Carey's request for permanent injunctive relief, we have appellate jurisdiction under 28 U.S.C. § 1291.[12]

## II. ANALYSIS

■ Our review of the district court's application and interpretation of legal principles predicate to its grant or denial of injunctive relief is plenary. *See Ortiz v.*

---

**9.** The trustee held the shares by nominees Cede & Co. and Bow & Co. but the latter was not involved in the proxy voting. *See* app. at 296–97.

**10.** Carey's allegations were refined at the trial where more specific statistics than those in the complaint were presented. Our description of the alleged errors is based on their full development in the record.

**11.** Although the judges are apparently still defendants, only PEI has filed a brief on appeal. In any case, it is clear that inasmuch as the results of the election have been certified and Carey now seeks only to bar implementation of the split, the election judges are only nominal parties.

**12.** We, of course, must also satisfy ourselves that the district court had jurisdiction. While there is no question but that there is diversity of citizenship, it is not obvious that the jurisdictional amount was met as this is not a damage action and only injunctive relief has been sought. Carey alleges, however, and it is admitted, that he owned four per cent of the shares of PEI on October 28, 1988, and his shares were worth approximately $5,900,000. Furthermore, he testified that he originally offered $55 a share for the PEI stock in April 1987, and increased the offer to $57.50. In the circumstances, we conclude that whatever may be the difficulty of determining the amount in controversy in some injunction actions, the $10,000 jurisdictional amount was met in this case. *See Rockwell v. SCM Corp.*, 496 F.Supp. 1123, 1125 (S.D. N.Y.1980); 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3703 (1985). The increase to $50,000 for the amount in controversy in diversity cases in the Judicial Improvements and Access to Justice Act, Pub.L. No. 100–702, § 201, 102 Stat. 4642, 4646 (1988), is not applicable to this action inasmuch as Carey's complaint was filed before the effective date of the change.

*Eichler,* 794 F.2d 889, 891 (3d Cir.1986).[13] Further, inasmuch as it is undisputed that Pennsylvania law is applicable, we must predict how the Supreme Court of Pennsylvania would decide the legal issues. *See Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699, 702 (3d Cir.1988).

■ The district court explained that under Pennsylvania corporate law:

> the appointment of election judges is perfectly proper and that such judges are charged with certain power and responsibility. Under 15 Pa.Stat.Ann. § 1512(c), judges of election are to 'hear and determine' (a) voting power, (b) authenticity, validity and effect of proxies, and (c) challenges and questions arising from the vote. The same statute provides that a determination of the judges of election is prima facie evidence of the facts surrounding the casting and counting of the votes. Within the framework of that legislation, therefore, the Courts are constrained to give considerable deference to the determination of the judges of election. *Carey,* slip op. at 4–5.

While we will assume that factual determinations of the election judges are entitled to deference, such judges are no better situated than this court to predict how the Pennsylvania Supreme Court would construe the statutory law governing the internal affairs of a Pennsylvania corporation. Thus, we will not defer to the election judges on legal issues, although we have considered their views.

■ Carey's challenge to the election judges' acceptance of the DRIP votes presents a question of statutory construction under the Pennsylvania Business Corporation Law. The statute dealing with record owners reads:

Unless the by-laws otherwise provide, the board of directors may fix a time, not more than fifty days prior to the date of any meeting of shareholders, or the date fixed for the payment of any dividend or distribution, or the date for the allotment of rights, or the date when any change or conversion or exchange of shares will be made or go into effect, as a record date for the determination of the shareholders entitled to notice of, or to vote at, any such meeting, or entitled to receive payment of any such dividend or distribution, or to receive any such allotment of rights, or to exercise the rights in respect to any such change, conversion, or exchange of shares. *In such case, only such shareholders as shall be shareholders of record on the date so fixed shall be entitled to notice of, or to vote at, such meeting or to receive payment of such dividend, or to receive such allotment of rights, or to exercise such rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after any record date fixed, as aforesaid.* Pa. Stat.Ann.tit. 15, § 1509 (Purdon 1967) (emphasis added).

On its face, the emphasized portion of this provision states that the record owners rather than the beneficial owners of the DRIP shares were entitled to vote those shares.[14] Accordingly, like other statutes establishing a record date, "the right to vote is no longer an incident of stock ownership, but an incident of finding the stockholder's name on the list of holders as of the record date." E. Aranow & H. Einhorn, Proxy Contests for Corporate Control 385 (2d ed.1968).

The district court recognized that the election judges counted the DRIP shares notwithstanding the foregoing statute.

---

**13.** Inasmuch as the stock has not been split the appeal is not moot. *See In re Cantwell,* 639 F.2d 1050, 1053–54 (3d Cir.1981); *Brill v. General Indus. Enters.,* 234 F.2d 465, 469 (3d Cir.1956). We do not by this statement imply that the appeal necessarily would have been moot if the split had been effectuated as it is possible that the shares could have again been combined.

**14.** This provision appears to be a codification of earlier Pennsylvania common law. In *Commonwealth ex rel. Eberhardt v. Dalzell,* 152 Pa. 217, 25 A. 535 (1893), the Pennsylvania Supreme Court stated that "[t]he general [common law] rule is that, as between the corporation and the person offering to vote, the right follows the legal title, of which the certificates and the stock books are the *prima facie* evidence." *Id.* at 223, 25 A. at 537.

Nonetheless, it upheld this action, observing that "the basic duty of the judges of election under the Pennsylvania Corporation law is to be as reasonable as possible and to avoid disenfranchisement on mere technicalities." *Carey,* slip op. at 14.

Carey cites both Pennsylvania law and the PEI by-laws in support of his argument that the election judges improperly credited the votes of the beneficial owners of the DRIP shares. In relevant part, Pa.Stat. Ann. tit. 15, § 1504(A)(Purdon 1967), provides that, save where otherwise indicated elsewhere in the relevant statutes or in the articles of incorporation, "every shareholder of record shall have the right, at every shareholders' meeting, to one vote for every share standing in his name on the books of the corporation."

Article I, Section 2 of the PEI corporate by-laws provides, in relevant part, that:

> [s]tockholders holding stock of the class or classes entitled to vote may vote the same at meetings either in person or by proxy duly executed in writing by the stockholder or his duly authorized attorney in fact. Each such stockholder shall be entitled to one vote for each such share of stock registered in his name on the books of the Company. App. at 634.

Together with the above quoted Pa.Stat. Ann. tit. 15, § 1509 (Purdon 1967), these provisions clearly indicate that the record rather than the beneficial owners of the DRIP shares were entitled to vote. Thus, we will reverse the judgment of the district court.[15]

In reaching our result we have not ignored PEI's reliance on Pa.Stat.Ann. tit. 15, § 1510 (Purdon 1967), but we conclude that nothing in that section can be construed to allow a beneficial owner in the situation of the DRIP shareholders to vote in place of the record owners absent a valid proxy.

While the section does say that the "original share ledger or transfer book, or a duplicate" shall be prima facie evidence as to the shareholders entitled to vote, that does not suggest that the positive provisions of Pa.Stat.Ann. tit. 15, § 1509 (Purdon 1967), are somehow displaced. At most it implies that a shareholder could show that the corporate records were incorrect as they did not reflect a transfer of shares that was duly reported to the transfer agent before the record date and should have been recorded in the share ledger or transfer book.

We recognize that the district court did not rely exclusively on the general policy favoring shareholder enfranchisement in upholding the determination of the election judges. It also relied heavily both on the above-quoted provision of the DRIP plan that participants will be permitted to vote their shares and the ruling of the election judges permitting the DRIP beneficial owners to vote their shares. *Carey,* slip op. at 14. In substance, this approach treats the beneficial owners of the DRIP shares as holding proxies from the record owners for the shares equitably owned. Carey rebuts this theory by noting that it is undisputed that the record owners, Loriot and Cede, neither granted an omnibus proxy to the beneficial owners, nor requested and acted on the instructions of the latter. Brief of Appellant at 33.

We cannot permit the DRIP plan to substitute for a proxy because to do so would not be consistent with the interest of the corporation and the stockholders in determining stock ownership quickly by reference to the books showing record ownership. *See Salgo v. Matthews,* 497 S.W.2d 620, 629 (Tex.Cir.App.1973). Thus, the Supreme Court of Pennsylvania has recog-

---

**15.** We also note that Carey further claims that if the DRIP shares were properly voted by the beneficial owners, he was prejudiced in being unable to solicit the owners of 8,829 shares of DRIP stock owned beneficially, for which there was no record ownership of stock. *See* Brief of Appellant at 29. While it is not explained in the briefs how a DRIP owner might not also be a record owner it may have been because the DRIP owner transferred his original shares through sale or other disposition. In response to Carey's argument, PEI points out that Carey did not forward proxy materials to the record owners for distribution to these beneficial owners, and that the amount of shares involved would not have affected the outcome of the election. *See* Brief of Appellee at 21 n. 8. Inasmuch as we conclude that the DRIP shares were not properly voted by the beneficial owners, we need not resolve this dispute.

nized that "[c]orporate elections cannot be stopped to settle nice questions of legal title, and it is important to the interests of the corporation that their elections should proceed under their own rules, and with their own officers." *Commonwealth ex rel. Eberhardt v. Dalzell*, 152 Pa. at 222, 25 A. at 536. Furthermore, a provision in a DRIP plan is simply not the same thing as a proxy. Moreover, we observe that the weight of authority establishes that the right to vote inheres in the record owner of the stock. *See, e.g., In re Giant Portland Cement Co.*, 26 Del Ch. 32, 39–41, 21 A.2d 697, 701 (1941); *Gunzburg v. Gunzburg*, 101 Misc.2d 896, 901, 422 N.Y.S.2d 577, 581 (Sup.Ct.1979), *aff'd*, 74 A.D.2d 636, 425 N.Y.S.2d 151 (2d Dept.1980); *Salgo v. Matthews*, 497 S.W.2d at 629. Thus, if the record owner does not personally vote the shares, it follows that any person who attempts to do so must have a formal proxy from the record owner. Surely a statement in a corporation's DRIP plan cannot be regarded as a proxy from the record owner.

In reaching our result we have not overlooked *Commonwealth ex rel. Langdon v. Patterson*, 158 Pa. 476, 27 A. 998 (1893). In *Patterson*, certain shareholders had sold their shares but retained a contingent right to resume title if the purchaser did not comply with the agreement which required payment on an installment basis. The contract of sale provided that the purchaser could vote the shares at an upcoming meeting, but nevertheless the selling shareholders voted the shares themselves. The purchaser did not attempt to vote the shares himself. The Supreme Court of Pennsylvania ruled that the votes by the sellers were illegal and stated:

> Prima facie, the right to vote accompanies the legal title, but when the title is divided, and an equity exists, as between pledgor and pledgee, trustee and cestui que trust, or, as in the present case, between vendor and vendee, with a title inchoate until payment, the right to vote is subject to the agreement of the parties. This is the rule not only of the common law, but also of the act of 1889. Our attention has not been called to any by-law of this corporation which in any way affects this result. *Id.* at 494, 27 A. at 999.

While we have considered *Patterson*, we conclude that in light of the subsequent enactment of the sections of the Pennsylvania Business Corporation Law above quoted and the development of corporate law elsewhere,[16] it is unlikely that the Supreme Court of Pennsylvania would today find such an agreement between the record owners and the beneficial owners sufficient to permit voting of shares by the latter. We further point out that in *Patterson* the court said that it did not have occasion to consider whether the purchaser could vote the stock as he made no offer to do so. Thus, even if the position of the beneficial owners of the DRIP stock is regarded as analogous to that of the purchaser in *Patterson*, *Patterson* is not authority for allowing them to vote. In any event, *Patterson*, which involved only a single purchase, can hardly be regarded as authority for the proposition that a DRIP plan providing for voting by beneficial owners may be substituted for a statutory requirement that only record owners or persons holding their

---

**16.** It has been observed that as a matter of general corporate law:

> Practical necessity, and the statutes, articles or bylaws that are the expression of it, requires some record or registration in addition to the certificate, whereby the ownership of the stock may be known, and thus the right to vote.... Consequently, in the absence of an express provision to the contrary, the rule is that the right to vote shares of stock is in the person who has the legal title, and this is to be determined, at least prima facie, from the books of the corporation, where stock is transferrable on the books.

5 C. Keating & J. Reinholtz, *supra*, note 7, § 2033, at 187.

This rule allows the election judges to rely on the corporate records. "The election officers are not a court. In the event of a dispute, the voting right is the only issue before them. The evidentiary force of the books and records of the corporation may be conclusive on the election officers but not upon a court." *Id.* at 190. In this case, "[t]he election officers will not, or need not, go behind the corporate records, but the courts may do so, as those records are subject to rebuttal." *Id.*

proxies may vote. The authorization of votes by beneficial owners in such circumstances can come only from the Legislature.

We also point out that, as the above-quoted portion of *Patterson* demonstrates, the Supreme Court of Pennsylvania recognized that the corporation could regulate the right to vote through its by-laws. Article I, section 2 of the PEI by-laws expressly ties the right to vote to ownership registered on the books of the company. Thus, even under *Patterson,* it appears that the record owners rather than the beneficial owners were entitled to vote the DRIP shares.

PEI also cites *In re Eastern Bancorporation,* 23 B.R. 474, 479 (Bankr.E.D.Pa. 1982), for the proposition that "in some circumstances the beneficial owners can vote their shares." Brief of Appellee at 19. That case involved a specific stock pledge agreement providing that upon default of the pledgor/record owner, the pledgee would become entitled to vote the stock immediately, as if he were record owner. There was a default and the pledgee voted the shares. The court held that in the circumstances present the pledge agreement governed over the provisions of Pa. Stat.Ann. tit. 15, § 1509 (Purdon 1967). But that decision was rendered in a situation in which the former officers were attempting to repudiate the agreements of the corporation. The case is in no sense authority for the proposition that a publicly owned corporation may not be required to comply with Pennsylvania law and its own by-laws in an action brought by a shareholder who did not participate in the challenged transaction.

In any event, we are not bound by *In re Eastern Bancorporation* and observe that the court did not cite any Pennsylvania cases directly supporting its holding.[17] Further, there is nothing in the opinion which suggests that the court would have decided the issue in the same manner where a pledgor/pledgee relationship was not involved. *See* Pa.Stat.Ann. tit. 15, § 1506 (Purdon 1967). Rather, it was concerned, as was the *Patterson* court, with an individualized transaction, not a large scale system of regularly by-passing Pennsylvania law and corporate by-laws.

### III. CONCLUSION

Overall, we are satisfied that inasmuch as the beneficial owners of the DRIP shares did not have a proxy from the record owners, they were not entitled to vote those shares. In reaching our result we have by no means overlooked the implications of our opinion as we infer from the determination of the election judges that the practice followed in this case may be wide-spread. Nevertheless, we are convinced that the Supreme Court of Pennsylvania would not condone the violation of Pennsylvania law on the theory that it is convenient to do so. If modern practices, such as the issuance of DRIP shares with direct voting rights, are not consistent with statutory law then it is the legislature and not the courts which must consider whether the law should be changed.[18] With the votes attributable to the DRIP shares invalidated, the district court could not properly allow the election judges to certify that the position of PEI management had the requisite votes. Accordingly, we will reverse the judgment of the district court of December 8, 1988, and will remand this

17. The court did quote the decision of another federal court, *Steinberg v. American Bantam Car Co.,* 76 F.Supp. 426 (W.D.Pa.1948), *appeal dismissed,* 173 F.2d 179 (3d Cir.1949), for the proposition that a court should not "permit, ... *those in control of a corporation,* through the reliance of technicalities or strict compliance with the provisions of law, to place a shareholder in a position where he is denied the right," 76 F.Supp. at 436 (emphasis added), to communicate with the other shareholders. On the facts of this case it is clear that Carey, a shareholder,

not PEI management, seeks to enforce strict compliance with the statutory provisions and the corporate bylaws.

18. The same thing is true with respect to the type of voting possible under modern communications. While we have not determined whether Pennsylvania law may be reconciled with telecopying and 800 numbers, if changes are necessary, or indeed even desirable, they must be made by the legislature, not the courts.

matter for the entry of a permanent injunction barring PEI from taking corporate action to implement the proposal. We note, however, that this injunction should not be understood to prevent PEI from again presenting its proposal to its shareholders and taking appropriate action pursuant to the outcome of any such election.

SLOVITER, Circuit Judge, concurring.

I concur in the majority's opinion. However, because this case squarely presents the issue of the validity of shareholder votes by telegraphic transmission and because this issue is likely to arise again either in another election on the same proposal by PEI or elsewhere, I believe that we should reach and decide the issue.

In connection with the shareholder vote in this case, the proxy solicitors arranged that shareholders could call a special 800 telephone number, identify themselves to the operator, and vote their shares by phone. The phone calls were taken by Churchill Computer Corp. or Western Union who prepared a telegram containing the language of the proxy cards and transmitted that vote by telegram. The judges of election counted all of the votes actually owned by the shareholder even though the number of shares listed by the shareholder in the telegram proxy was fewer than those actually owned.

Carey challenges both the validity of the proxygram and the action of the election judges in crediting votes in excess of the shares indicated as voted by the telegram. The resolution of the DRIP share issue means that we do not have to involve ourselves on this appeal with the number of votes credited by telegram proxy. Because, however, I believe that the entire procedure of crediting telegraphic votes is invalid under current Pennsylvania law, I think it appropriate to state why.

Pennsylvania law requires, *inter alia*, that "[e]very proxy shall be executed in writing by the shareholder, or by his duly authorized attorney in fact, and filed with the secretary of the corporation." 15 Pa. Stat.Ann. tit. 15, § 1504(A). Unlike the facsimile proxies also credited by the elec-

tion judges in this case, the telegram proxies contain no shareholder's signature. There is also a complete absence of a paper trail which would evidence that the shareholder in fact appointed Western Union or Churchill Computer Corp. to act as agent.

The possibility of fraud is patent, since nothing in this record suggests that the recipient of the 800 call had the ability to check whether the caller was in fact the shareholder. *See generally*, Varalla, *Datagram Proxies: Gaps at the Interface Between Law and Technology*, 2 The Computer Lawyer, August 1985 at 19, 20. Apparently the only information required of the putative shareholder was the identity of the shareholder. Anyone with that knowledge could vote the shares of a shareholder who, for one reason or another, such as illness, absence or disinterest, failed to vote the shares. It is even possible that this procedure could be used to override an earlier valid vote by the shareholder.

PEI argues that crediting telegram proxies is an accommodation to new technology and the computer age. This is an argument more properly addressed to the Pennsylvania legislature which may, if it so chooses, specifically provide for this type of voting of shares but which may also include various safeguards to insure that votes are properly cast and credited. Until the Pennsylvania legislature acts, I would hold that shares voted by proxies in the manner shown in this record are invalid and should not be credited.