Steven E. **PERILSTEIN** et al.,

v.

**UNITED GLASS CORPORATION.**

No. CIV02–8076.

United States District Court, E.D. Pennsylvania.

March 14, 2003.

MEMORANDUM

DALZELL, District Judge.

Plaintiffs in this diversity action, Steven Perilstein, Marcie Perilstein, Ettie Perilstein, and Max Perilstein, were formerly shareholders of Perilstein Distributing Corporation, a Pennsylvania corporation whose principal place of business was in Pittsburgh. In 1999, the Perilsteins sold the family corporation to defendant United Glass Corporation ("UGC"), a Georgia corporation whose principal place of business is in Louisville, Kentucky. Pursuant to the sale, the Perilsteins received a handsome amount of UGC stock, and Perilstein Distributing Corporation became a wholly-owned subsidiary of UGC.

On October 10, 2002, the Perilsteins, acting through their counsel, demanded that UGC allow inspection of some twenty-five categories of corporate records. *See* Compl. ¶ 21; Pls.' Resp. Ex. D.[1] UGC refused to comply on the ground that the Perilsteins' demand did not conform with Georgia's shareholder inspection statute. Pls.' Resp. Ex. E at 2–3, *citing* Ga.Code Ann. § 14–2–1602. The Perilsteins then filed suit in this Court, seeking an order, pursuant to "both common law and Pennsylvania statutory law," requiring UGC to make its books and records available for inspection. Compl. ¶ 23.

Before us is UGC's motion to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1), (2), (3) and (6). As UGC questions our jurisdiction, we turn first to the Rule 12(b)(1) part of its motion.

*Subject Matter Jurisdiction*

■ Three of the four plaintiffs are citizens of Pennsylvania and one is a citizen of Michigan. Since UGC is a Georgia corporation with its principal place of business in Kentucky, the citizenship of the parties is diverse. This leaves the question of the amount in controversy.

Richard E. Miller, Braverman, Kaskey & Caprara, Philadelphia, PA, for plaintiff.

Marc J. Sonnenfeld, Morgan Lewis, Philadelphia, PA, for defendant.

1. The Complaint refers to the demand letter as well as UGC's response and states that they are attached as Exhibits A and B, but neither letter is in fact attached to the Complaint. Compl. ¶¶ 21–22. However, the Perilsteins have attached the letters to their response to UGC's motion to dismiss. *See* Pls.' Resp. Ex. D & E. We consider this correspondence in resolving the motion be-

cause both letters are mentioned in the Complaint and are central to the Perilsteins' claim. *See Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 558 (3d Cir.2002) (describing circumstances in which a court can consider evidence in the record without converting a motion to dismiss into a motion for summary judgment).

The Perilsteins allege that $12 million in stock was involved in the sale, and they further assert that since then UGC has offered to buy them out for about $2.5 million, which would mark a $9.5 million decline in the value of their shares. Pls.' Resp. at 8; *see also* Steven Perilstein Aff. ¶¶ 6–7. To be sure, the Perilsteins in this action seek to vindicate an intangible right, *i.e.*, their right as shareholders to inspect corporate records. Some commentators have found that the enterprise of valuing controversies about such rights is an intellectual and economic bog. *See, e.g.*, Kennedy, *Valuing Federal Matters in Controversy: Hohfeldian Analysis in Symbolic Logic*, 35 Tenn. L.Rev. 423, 435 (1968) ("rules are substantially ambiguous and meaningless").

But the jurisprudence appears reasonably settled that it is the value to be protected—not the intangible right in a vacuum—that is the polestar to which we should set our amount in controversy compass. *See In re Corestates Trust Fee Litigation*, 39 F.3d 61, 65 (3d Cir.1994); Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, 14B *Federal Practice and Procedure* § 3703 (3rd ed. 1998) ("[T]he amount in controversy is measured by what the plaintiff seeks to gain or protect—the pecuniary consequences to him—or, as it often is phrased, the value of the object of his action." (citation omitted)).

The value that plaintiffs seek to protect here thus in one sense appears to be at least $2.5 million, which is the current value of the UGC shares that the family owns, at least as UGC is said to value them. *Rockwell v. SCM Corp.*, 496 F.Supp. 1123, 1125 (S.D.N.Y.

1980) (holding that, in an action to enforce inspection rights, "the proper measure of the amount in controversy is the value of the plaintiff's shares"), *cited with approval* in *Carey v. Pennsylvania Enterprises, Inc.*, 876 F.2d 333, 337, n. 12 (3d Cir.1989). Assuming equal shares,[2] each plaintiff's interest would be worth $625,000.00. On the other hand, to the extent this action is the opening shot in derivative litigation, the harm to UGC, at least measured by the 79.2% diminishment of the market value in the Perilsteins' stock, is on the family's holdings alone $9.5 million, which would be a decline per family member of $2,375,000.00.

In the absence of any other antipode of value, the two we have identified confirm for us that we cannot hold to *Red Cab*[3] "certainty" that the amount in controversy here is below the jurisdictional threshold.[4] We conclude that we have jurisdiction over the subject matter of this suit.

Even if the Perilsteins could overcome the considerable obstacles to this Court's assertion of personal jurisdiction over UGC identified in UGC's motion, we must still dismiss the Complaint because the Perilsteins' demand letter failed to set forth their purposes for seeking inspection of UGC's books and records. *See* Pls.' Resp. Ex. D. We therefore put to one side the highly complex Rule 12(b)(2) and (3) aspects of UGC's motion, and turn our attention to Rule 12(b)(6).

*The Merits*[5]

■ Under the Pennsylvania Business Corporation Law of 1988, a shareholder seek-

**2.** The complaint does not mention the precise number of shares each plaintiff owes, but only mentions the family's aggregate interest.

**3.** *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

**4.** Indeed, assuming that each Perilstein has a quarter of the 1,200,000 family total shares, the value-in-a-vacuum would only have to be minutely in excess of twenty-five cents per share to cross the jurisdictional amount threshold.

**5.** In resolving a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), we look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20

F.3d 1250, 1261 (3d Cir.1994). We accept as true all factual allegations in the complaint, and we draw all reasonable inferences therefrom in the light most favorable to the non-movant. *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 325 (3d Cir.2001). Although we need not accept as true "unsupported conclusions and unwarranted inferences," we must deem the complaint to have alleged sufficient facts if it adequately provides the defendants with notice of the essential elements of the plaintiff's claims. *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir.2000); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.1997). We may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hi-*

ing to inspect corporate books and records must first submit a "written verified demand stating the purpose thereof," and the shareholder may not apply for a court order until the corporation refuses to permit inspection or fails to reply within five business days after the demand was made. 15 Pa.C.S.A. § 1508(b) and (c) (hereinafter "Section 1508").

Even if the Perilsteins had complied with the requirements of Section 1508, the internal affairs doctrine would have drastically limited their right to inspect UGC's books and records.[6] Under longstanding Pennsylvania law, "a court will not take jurisdiction for the purpose of regulating or interfering with the internal management or affairs of a foreign corporation." *Kahn v. Am. Cone & Pretzel Co.*, 365 Pa. 161, 74 A.2d 160, 163 (1950). The doctrine precludes Pennsylvania courts from ordering the inspection of a foreign corporation's books and records unless the books and records are located within the Commonwealth. *Id.; see also Donna v. Abbotts Dairies, Inc.*, 399 Pa. 497, 161 A.2d 13, 16 (1960).

If Pennsylvania courts would refuse to exercise their jurisdiction over a species of non-federal claim, this Court must obey the Commonwealth's jurisdictional rule. *Genetti v. Victory Markets, Inc.*, 362 F.Supp. 124, 126 (M.D.Pa.1973), citing *Angel v. Bullington*, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947) and *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The internal affairs doctrine would therefore bar this Court from entertaining an action under Section 1508 except to the extent it sought to compel inspection of UGC's books and records located in Pennsylvania.

The Perilsteins' failure to comply with the requirements of Section 1508(a), however,

does not entirely dispose of this case. The Complaint also asserts that the Perilsteins have a common law right of inspection, and it is, perhaps, possible that the Perilsteins have stated a non-statutory claim under the common law of Pennsylvania, Georgia, or Kentucky.[7]

As United States Supreme Court Justice William Day noted almost a century ago, "[t]here can be no question that the decisive weight of American authority recognizes the common-law right of the shareholder, for proper purposes and under reasonable regulations as to place and time, to inspect the books of the corporation of which he is a member." *Guthrie v. Harkness*, 199 U.S. 148, 153, 26 S.Ct. 4, 50 L.Ed. 130 (1905). Justice Day, of course, wrote decades before the Supreme Court's adoption of the *Erie* doctrine. *Guthrie* also antedated the advent of statutory inspection rights, which now exist in Pennsylvania, *see supra*, as well as in Kentucky, where UGC maintains its principal place of business, and in Georgia, where UGC is incorporated. *See* Ky.Rev.Stat. Ann. § 271B.16–020; Ga.Code Ann. § 14–2–1602.

In determining whether the Perilsteins have stated a common law claim, we need not engage in the choice-of-law analysis required under *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), because we predict that the highest appellate courts in all three states would dismiss such a claim. *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997) ("[W]here the laws of the ... jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question.").

Even if the common law of Kentucky, Georgia, or Pennsylvania once permitted a

---

shon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

**6.** The Perilsteins assert that the Pennsylvania Business Corporation Law has abrogated the internal affairs doctrine. Pls.' Resp. at 18. This argument ignores 15 Pa.C.S.A. § 4145, which strips "foreign domiciliary corporations" of the doctrine's protection but otherwise affirms that, with certain exceptions not relevant here, the Business Corporation Law "shall not be construed to regulate the ... internal affairs of a

foreign corporation for profit." 15 Pa.C.S.A. § 4145(a) and (d). UGC is not a "foreign domiciliary corporation" within the meaning of 15 Pa. C.S.A. § 4102(a), and the internal affairs doctrine therefore applies here in its full, time-honored glory.

**7.** Of course, as a federal court sitting in diversity in Pennsylvania, we would be required to apply the internal affairs doctrine to any such common law claim.

shareholder to obtain a court order compelling the production of corporate records without first making a written demand stating the shareholder's purpose [8], each state now has a statutory scheme that clearly abrogates any such hypothesized common law right. We have already described Pennsylvania's Section 1508. The Georgia and Kentucky statutes similarly provide that a shareholder seeking an order to compel the production of corporate records (other than the articles, bylaws, and a few other categories of records that the Complaint derides as "certain innocuous documents," Compl. ¶ 22) must first make a written demand on the corporation that "describes with reasonable particularity his purpose ...." Ga.Code Ann. §§ 14–2–1602(d)(2) and 14–2–1604(b); Ky.Rev.Stat. Ann. §§ 271B.16–020(3)(b) and 271B.16–040(2).

We pause to consider one final dimension of Georgia and Kentucky's shareholder inspection schemes. The statutes also provide that they do not affect "[t]he power of a court, independently of this chapter, to compel the production of corporate records for examination." Ga.Code Ann. § 14–2–1602(f)(2); Ky.Rev.Stat. Ann. § 271B.16–020(5)(b). Both states adopted this language from Section 16.02(e) of the Model Business Corporation Act ("MBCA"), whose Official Comment explains it in these terms:

> Section 16.02(e) provides that the right of inspection granted by section 16.02 is an independent right of inspection that is not a substitute for or in derogation of rights of inspection that may exist ... as a 'common law' right of inspection, if any is found to exist by a court, to examine corporate records. Section 16.02(e) simply preserves whatever independent right of inspection exists under these sources and does not create or recognize any rights, either expressly or by implication.

*Model Bus. Corp. Act* § 16.02 cmt.4 (1985).

Thus, the effect of Georgia and Kentucky's adoption of MBCA § 16.02(e) is simply that

we must perform our duty (already *Erie*-mandated) to predict whether these states' courts would enforce some vestigial common law right of a shareholder to obtain a court order without first making a written demand on the corporation describing the purpose of the inspection. We find it inconceivable that the Georgia, Kentucky, or Pennsylvania Supreme Court would subvert the well-ordered statutory schemes described above by recognizing the continued existence of such a common law right, assuming it ever existed in any of these states.

We therefore dismiss the Perilsteins' claim, in both its statutory and common law guises, in its entirety.

---

8. We have found no decision in any of these jurisdictions that expressly adopts or rejects this proposition. We note, however, that William Fletcher's twenty-volume treatise on corporation law states that "[a]t common law, the shareholders were required to accompany their request for inspection with a statement of their purpose or reason for desiring inspection, if it was asked by the corporation or the custodian of the books and records." 5A *Fletcher Cyclopedia of the Law of Private Corporations* § 2247, at 493 (Perm. Ed.).