Barbara S. LARKIN and Edwin F. Hale, Sr., et al.

v.

BALTIMORE BANCORP.

BALTIMORE BANCORP

v.

BALTIMORE BANCORP STOCKHOLDERS COMMITTEE.

Civ. Nos. JFM–91–1239, JFM–91–1410.

United States District Court, D. Maryland.

June 21, 1991.

---

William Hylton, Jr., Hylton and Gonzales, Baltimore, Md., William Bradford Reynolds and Philip S. Friedman, Washington, D.C., for plaintiffs.

David Clarke, Jr. and James D. Mathias, Piper and Marbury, Baltimore, Md., for defendants.

## OPINION

MOTZ, District Judge.

These cases arise from a proxy contest for control of Baltimore Bancorp (the

"Bank") between a group of dissident stockholders led by Edwin F. Hale ("Dissidents") and the Bank's current management ("Management"). Under the Bank's existing bylaws six of its eighteen directors were to be elected at the annual stockholders meeting held in May. Dissidents fielded a slate of six candidates for those positions and, in an election whose results are not here challenged, Dissidents' six candidates were elected.

Dissidents also presented proposals for stockholder vote which would, in effect, amend the Bank's bylaws to increase the number of directors from eighteen to twenty-eight and permit the immediate filling of the ten new directorships thus created. In accordance with their proposals, Dissidents presented a slate of ten candidates for the new positions. Management opposed the Dissidents' proposals and did not field any candidates for the ten new positions.

The stockholders have now voted on Dissidents' proposed amendments, and in this action the parties seek declaratory relief on three issues whose resolution will determine the outcome of the vote. These issues are as follows: (1) whether § 7.07 of the Bank's bylaws requiring an 80% stockholder vote to amend the bylaws affected by Dissidents' resolution is valid; (2) whether Management's designees should have been permitted to cast as votes against the proposed amendments proxies which they obtained from stockholders authorizing them to use their discretion in voting on matters which were to come before the annual stockholders meeting; and (3) whether The Corporation Trust Company ("CT") (whom the stockholders elected to count the votes) properly decided two challenges made by Management to the vote count.[1]

For the reasons stated *infra*, I find, with respect to the first two issues, that bylaw § 7.07 is not valid but that Management was entitled to vote the proxies as they did. As to the third issue, I find merit in Management's contention that CT erred in deciding to count as abstentions on Dissidents' proposed amendments the approximately one million votes submitted by Independent Election Corporation of America ("IECA") and ADP Financial Information Services, Inc. ("ADP"). However, because I further find that there was an ambiguity in the proxy communications sent by IECA and ADP to their clients which makes it impossible to determine how the one million votes in question were intended to be cast, I will order that a new election be held.

## I.

Section 2.02 of the Bank's existing bylaws confers upon the board of directors the power to establish (up to 30) the number of directors. As indicated above, the Bank currently has eighteen director positions. In order to promote stability in management, under both the charter and the bylaws, directors are divided into three classes of equal numbers, one class being elected each year.

Adoption of Dissidents' proposals would effectively repeal § 2.02 and replace it with provisions which would (1) empower the stockholders to set the number of directors, (2) increase the number of directors from eighteen to twenty-eight, and (3) permit the immediate election of the ten new directors.

The threshold question presented is whether a simple majority or an 80% supermajority of stockholder votes is required to adopt Dissidents' proposed amendments.

---

**1.** Management also contends that abstentions should be counted as "votes cast" within the meaning of Md.Corps. & Ass'ns Code Ann. § 2–506(a). If that were correct, the contention would be the sword which cut the Gordian knot since it would render academic all of the other issues presented. However, the contention does not have merit. Although Management argues that the Supreme Court of Delaware has implicitly held to the contrary, *see Berlin v. Emerald Partners*, 552 A.2d 482, 491 (Del.1989), the weight of authority establishes that "votes cast"

do not include abstentions. *See, e.g., Bank of N.Y. Co. v. Irving Bank Corp.*, 140 Misc.2d 508, 531 N.Y.S.2d 730, 731–32 (N.Y.Sup.Ct.1988), *aff'd without opinion*, 143 A.D.2d 1070, 533 N.Y.S.2d 411 (N.Y.App.Div.1988); *Mageau v. Wedlock*, 505 A.2d 414, 417 (R.I.1986); H. Robert, *Robert's Rules of Order* § 43, at 395 (1990 ed.). Common sense supports the majority view. Certainly, a Bank stockholder who purposely chose to abstain on Dissidents' proposals did not intend to cast, in effect, a vote in favor of Management on the issues.

The starting point for resolving this question is § 7.07 of the bylaws, which provides as follows:

> Subject to the special provisions of Section 2.02 and except as provided in the next sentence, (a) any and all provisions of these By–Laws may be altered or repealed and new by-laws may be adopted at any annual meeting of the stockholders, or at any special meeting called for that purpose, and (b) the Board of Directors shall have the power, at any regular or special meeting thereof, to make and adopt new by-laws, or to amend, alter or repeal any of the By–Laws of the Corporation. Notwithstanding anything in the Charter or these By–Laws to the contrary, the affirmative vote of the holders of at least 80% of the voting power of all classes of shares entitled to vote in the election of directors shall be required to amend, repeal, or to adopt any provision inconsistent with Sections 2.01 through 2.06 of the By–Laws.

Dissidents contend that the super-majority vote requirement for stockholder amendment of bylaw §§ 2.01 through 2.06 violates Md.Corps. & Ass'ns Code Ann. § 2–506(a)(2) (hereinafter "GCL § 2–506(a)(2)"). That section provides:

> Unless this article or the charter of a corporation provides otherwise, ... [a] majority of all the votes cast at a meeting at which a quorum is present is sufficient to approve any matter which properly comes before the meeting.

Management, pointing to the "unless this article ... provides otherwise" clause in this section, counters by arguing that another section of Maryland's Corporation and Associations Code, § 2–109(b) (hereinafter "GCL 2–109(b)"), does "provide otherwise." Section 2–109(b) states:

> After the organization meeting of the board of directors, the power to adopt, alter, and repeal the bylaws of the corporation is vested in the stockholders except to the extent that the charter or bylaws vest it in the board of directors.

Management reads GCL § 2–109(b) as meaning that the power to amend bylaws resides in the first instance in the stockholders but that this power may by bylaw provision be vested entirely in the directors. Thus, according to Management, bylaw § 7.07 could have been written to completely divest the stockholders of the power to amend bylaw §§ 2.01 through 2.06. The power to do the greater necessarily includes the power to do the lesser, reasons Management. Therefore, Management concludes, the imposition of an 80% super-majority requirement (which is less severe than total divestment of shareholder voting power) is authorized by GCL § 2–109(b) and excluded (by virtue of the "provides otherwise" clause of GCL § 2–506(a)) from the general statutory ban against super-majority requirements.

Dissidents interpret GCL § 2–109(b) differently. They start from the premise that the power to amend bylaws is an inherent right of the stockholders and that it cannot be infringed absent a charter or statutory provision to the contrary. In their view GCL § 2–109(b) is not such a provision; it merely authorizes the adoption of bylaws which vest in the directors a power to amend bylaws which is concurrent to that of the stockholders.[2]

---

**2.** Dissidents argue that history as well as theory supports their position. They point out that prior to the adoption of the predecessor to § 2–506(a) in 1951, bylaws could "require for any purpose a proportionate vote greater than that required by statute for such purpose." See H. Brune, *Maryland Corporation Law* § 68 (1933 ed.). The reporter's notes to the 1951 revisions of Maryland's Corporation Laws state that

> the only substantive change which has been made is that any provision authorizing action to be taken by a corporation with a greater or a smaller portion of votes than required by the statute must be contained in the charter,

whereas under present law such a provision may be included either in the charter or in the by-laws.

This statement was favorably quoted by the Maryland Court of Appeals by way of dictum in *Roland Park Shopping Center v. Hendler*, 206 Md. 10, 22, 109 A.2d 753, 758 (1954). However, it is clear from the language of GCL § 2–506(a) itself that a super-majority requirement is allowable if authorized elsewhere in the Corporations article of the Code, and no Maryland case has considered the question of whether, as Management argues, GCL § 2–109(b) does provide such authorization.

Resolution of this question is not clear.[3] The parties' respective contentions contain echoes of constitutional debates held more than two centuries ago. Management, playing the role of the Federalists, would have me hold that the law necessarily grants to those in positions of corporate authority sufficient power to exercise their authority responsibly. Dissidents, like Jeffersonians jealous of the rights of the people, posit that any grant of power in derogation of the rights of the populace of stockholders must be direct and express.

If I deemed it necessary to decide the question, I would rule in favor of Management, albeit on the more mundane ground of statutory construction. Dissidents' interpretation of GCL § 2–109(b) depends upon their reading into the statute an implicit premise that the stockholders' power to amend is not only primary but also inviolate. When the legislature has spoken, however, there is no reason to assume that its meaning lies in what it has left unsaid. It is mere conjecture to suppose that when enacting GCL § 2–109(b) the General Assembly proceeded from Dissidents' silent premise and intended to mandate that bylaws can never confer exclusive amendment power upon the directors. To the contrary, as Management argues, the "vested in the stockholders except to the extent ... vest[ed] ... in the board of directors" language suggests that the General Assembly contemplated that there might be a transfer of power from the stockholders to the directors.

█ The reason I do not consider it necessary to decide the question, however, is that I believe bylaw § 7.07 to be invalid even if Management's construction of GCL §§ 2–109(b) and 2–506(a)(2) is correct. Because my analysis depends upon a close reading of the language of the bylaw, I will quote it again.

Subject to the special provisions of Section 2.02 and except as provided in the next sentence, (a) any and all provisions of these By–Laws may be altered or repealed and new by-laws may be adopted at any annual meeting of the stockholders, or at any special meeting called for that purpose, and (b) the Board of Directors shall have the power, at any regular or special meeting thereof, to make and adopt new by-laws, or to amend, alter or repeal any of the By–Laws of the Corporation. Notwithstanding anything in the Charter or these By–Laws to the contrary, the affirmative vote of the holders of at least 80% of the voting power of all classes of shares entitled to vote in the election of directors shall be required to amend, repeal, or to adopt any provision inconsistent with Sections 2.01 through 2.06 of the By–Laws.

Management interprets this language as authorizing the directors, as well as 80% of the shareholders, to amend §§ 2.01 through 2.06. I simply do not agree. The first sentence of the section confers concurrent power to amend in the stockholders and the directors "except as provided in the next sentence." The next sentence provides that "[n]otwithstanding anything in ... these By–Laws to the contrary, the affirmative vote of ... at least 80%" of the stockholders is necessary to amend bylaw §§ 2.01 through 2.06. The first sentence of the section (granting concurrent amendment power in the stockholders and the directors) is unquestionably a bylaw provision which falls within the notwithstanding clause of the second sentence, and the second sentence grants the power to amend bylaw §§ 2.01 through 2.06 *only* to 80% of the stockholders. If § 7.07 had been intended to mean that the directors, as well as 80% of the stockholders, have the power

---

**3.** The question is sufficiently close that it brings to mind a colloquy between three baseball umpires of different philosophical schools. An idealist was the first to speak. He pronounced to his colleagues "Some are balls, some are strikes and I call them as they are." The second, a pragmatist, demurred, stating "Some are balls, some are strikes and I call them as I see them." The third was an existentialist. After pondering a moment, he opined "Some are balls, some are strikes, I call them as I see them, and that's the way they are." However genuine my efforts to resolve the super-majority question by objective criteria may be, I would be deceiving myself if I did not confess that there is at least some degree of truth in what the existentialist umpire had to say.

to amend §§ 2.01 through 2.06, it would have been easy to make that clear. For example, a clause could have been included in the second sentence immediately after the notwithstanding clause stating that "in the event of stockholder action" an 80% vote is required. No such language is present.

■ For these reasons I conclude that § 7.07 does not confer authority upon the directors to amend §§ 2.01 through 2.06. In my view this point is dispositive. As set forth above, the 80% vote mandated by § 7.07 can be saved from GCL § 2–506(a)'s ban against super-majority votes only by reference to GCL § 2–109(b). Since the latter section permits (at the most) the imposition of a super-majority stockholder vote for the amendment of bylaws only to the extent that the power to amend has been vested in the directors, the failure of § 7.07 to vest the power to amend §§ 2.01 through 2.06 in the directors is fatal to its validity. Not being saved by GCL § 2–109(b), it is prohibited by GCL § 2–506(a).

I tentatively expressed these views during oral argument, and counsel for Management responded by arguing that I was reading § 7.07 too narrowly. Rather than concentrating upon the question of the power to amend §§ 2.01 through 2.06 specifically, I should, according to Management's counsel, consider the bylaw in its entirety as allocating amendment power generally between the stockholders and directors. Since, thus viewed, the bylaw does vest some amendment power in the directors (i.e. the power to amend all bylaws other than §§ 2.01 through 2.06) it is within the purview of GCL § 2–109(b).

In my judgment this argument extends abstract logic too far. I am prepared to accept, as Management contends, that GCL § 2–109(b) permits not only the conferral of concurrent stockholder/director amendment power but also a divestment of stockholder power in favor of director power. However, nothing in the statutory language suggests that in enacting GCL §§ 2–109(b) and 2–506(a) the General Assembly intended that the directors could create a vacuum in which neither the directors nor a majority of the stockholders have the power to act. To the contrary, the very "vested in ... except to the extent [otherwise] vest[ed]" language upon which Management relies to support its interpretation of GCL § 2–109(b) implies a fullness of vested power and a direct correlation between any divesting of stockholder power and vesting of director power.

II.

The second issue presented is whether Management may use discretionary proxies, solicited before the battle for control erupted, to vote against Dissidents' proposed bylaw amendments. As described *infra*, directly related to this issue is the question of whether Management lawfully adjourned the annual stockholders meeting from May 22, 1991 to May 28, 1991.

A.

In anticipation of the annual stockholders meeting, on April 9, 1991, Management mailed to the Bank's stockholders a copy of its proxy statement and a proxy card. This proxy card (the "white proxy") listed, as of April 9th, all of the proposals that had been qualified for inclusion on the annual meeting's agenda and contained a provision (the discretionary authority provision) which, if signed, authorized representatives of Management to vote on behalf of the stockholder "IN THEIR DISCRETION on such other matters as may properly come before the meeting."

According to statements which he has made to the press, Hale was "recruited" by certain stockholders of the Bank to "lead the charge" against Management in March 1991. Shortly thereafter, he formed a "stockholders committee" and, according to deposition testimony which he has given, on or about April 1, 1991 he decided to undertake the proxy contest. In early April the committee made public announcements concerning its general goal of gaining control of the Bank. However, by April 9th Hale and his group had not filed any proxy materials with the SEC or publicly stated the specific means by which they intended to gain control of the Bank.

Therefore, the materials which Management circulated with the white proxy on April 9th did not mention any impending control battle.

It was not until May 10th that Dissidents filed with the SEC their proxy materials, including their own blue proxy card, soliciting votes on behalf of their candidates and in support of their proposals. This was only twelve days (and only eight business days) prior to the scheduled annual meeting. On May 13, 1991 (the first business day after Management saw Dissidents' proxy materials), Joseph B. Frumkin, an attorney for Management, contacted Eric D. Kline, a lawyer on the SEC's staff, to inquire if Management would be permitted to use the discretionary authority conferred by returned white proxies to vote against Dissidents' proposals. After considering the matter, on May 14th Gregg W. Corso, special counsel in the SEC's Office of Tender Offers, sent a letter to Management in which he stated, *inter alia:*

> Consistent with Rule 14a–4, a solicitor may not exercise discretionary authority granted by a proxy with respect to matters known a reasonable time prior to the meeting. Exercising discretionary authority with respect to matters known twelve days prior to the meeting does not appear consistent with the requirements of the rule.... Consequently, if the Company wishes to retain discretionary authority in its WHITE card to vote on the Amendment of the Bylaws relating to a change in the number of directors and/or increase the number of directors from 18 to 28, shareholders must be provided with a new card which enables shareholders to vote with respect to each of these matters and clearly discloses the manner in which any previously obtained proxies will be voted.

This letter was transmitted by the SEC to Frumkin by fax at 6:25 p.m. on May 14, 1991.

Immediately after receiving this letter, Frumkin telephoned Corso. Corso confirmed that in order to preserve Management's right to vote the white proxies against Dissidents' proposals, Management should provide stockholders with new proxy cards; include Dissidents' proposals on the new card; and disclose to the stockholders that the discretionary authority on the white proxy would, unless revoked, be used to vote against Dissidents' proposals. Corso stated that if Management took these actions, it could continue to make further written solicitations without losing the right to exercise discretionary authority against Dissidents' proposals.

On the night of May 14th Frumkin drafted a proxy card and letter to stockholders in accordance with Corso's instructions; these materials were filed with the SEC when it opened on the morning of May 15th. Courtesy copies sent to Corso and Kline were not delivered as Frumkin had directed. Upon learning this, Frumkin immediately faxed a copy of the materials to Kline. In the early evening of May 15th Kline provided written comments concerning Management's proposed letter to stockholders. At 2:55 a.m. on May 16th Frumkin telecopied to the SEC Management's responses to the comments. After the start of business on May 16th, Kline advised Frumkin that the SEC had no further comments and that Management could mail the letter and proxy as filed. Late on May 16th and on May 17th, the stockholders' letter and the new proxy card (the "green-striped proxy") were mailed to stockholders and provided to banks and brokerage firms.

On May 17–18th Management ran a newspaper advertisement in *The Baltimore Sun* urging stockholders to return the white proxies, as opposed to the green-striped proxies. On Saturday, May 18, the SEC raised questions about this advertisement. On the following Monday and during the morning of the following Tuesday (May 20 and May 21) there were discussions between Frumkin and the SEC concerning the possible need to postpone the annual meeting because of the advertisement. Although the discussions were inconclusive, they ended with both parties considering the possibility that the annual meeting would be held as scheduled on May 22nd but that the Bank would contin-

ue to accept votes until 5:00 p.m. on Friday, May 24, 1991.

Another development then intervened. In a tactical counterattack, Management had requested a decision from the Board of Governors of the Federal Reserve System on certain questions raised by Dissidents' attempt to gain control of the Bank.[4] On the afternoon of May 21, 1991, the Federal Reserve Board rendered a decision generally favorable to Dissidents. Understandably, in the SEC's view this decision was a material development in the proxy contest about which stockholders should be informed. Accordingly, the SEC suggested that voting at the annual meeting be extended a week until 5:00 p.m. on Wednesday, May 29, 1991. Management strongly opposed this suggestion. However, after the SEC threatened to bring an action to enjoin the meeting if another solution were not found, Management agreed that the annual meeting would be held as scheduled on May 22nd but that it would be adjourned until 12:00 noon on Tuesday, May 28th to permit stockholders to vote their proxies in the interim. Management issued a press release, cleared with the SEC, which described the rulings made by the Federal Reserve Board and the agreement which had been reached between the SEC and the Bank concerning the adjournment.

The first session of the annual meeting was held, as scheduled, on May 22nd. Counsel for Management explained that the meeting would be adjourned because of the concerns expressed by the SEC. After other business was conducted (including a vote on the question of whether CT or Manufacturers Hanover Trust Company, Inc. ("MHTC") should be appointed to count the proxies), a motion for adjournment was made and seconded. The chairman then ordered an adjournment without taking a vote of the stockholders (which was required by the Bank's bylaws).

### B.

■ Dissidents contend that it was improper for Management to use the white proxies to vote against Dissidents' proposed bylaw amendments because the proxies were solicited solely for the purpose of voting on routine matters which might arise at the annual stockholders meeting. They further contend that Management's subsequent efforts to expand the scope of the authority conferred by the proxies were unavailing.

Dissidents' contentions are without merit. Undoubtedly, there were imperfections in the proxy solicitation process. However, it was Dissidents themselves, not Management, who were primarily responsible for those imperfections. Hale and his group had decided in early April to fight for control of the Bank. However, it was not until May 10th that they filed their proxy materials with the SEC and made known the specific means by which they intended to gain control. Although as a matter of gamesmanship this strategy may have been advantageous to them, it hardly served the public interest in an orderly and deliberate consideration of the issues involved in the proxy contest.

In contrast, Management acted with diligence in responding to Dissidents' SEC filings. Management's own initial proxy materials, distributed on April 9, 1991, did not, of course, address the issues presented in the impending control battle because Dissidents had not yet articulated any specific proposals. However, on the first business day after Management received Dissidents' filings, Frumkin, on behalf of Management, asked the SEC whether Management could vote the discretionary authority contained in the white proxies against Dissidents' proposals. Immediately after members of the SEC staff had responded to Frumkin on that issue, he drafted materials for the SEC's review. These materials were sent out by Management as soon as the SEC had made its final comments on them.

Management did make one mistake during the solicitation process. The advertise-

---

**4.** Those questions related to whether Dissidents were required to make a filing pursuant to the Change in Bank Control Act and to the eligibility of three of Dissidents' candidates to serve as directors. The Federal Reserve Board ruled that a CIBCA filing was not necessary and that two of the three candidates were eligible to serve.

ment which it ran in *The Baltimore Sun* on May 17–18 urged the stockholders to return the white proxies rather than the green-striped proxies. This error concerned the SEC and led to discussions between the SEC and Frumkin which ended in both parties considering the possibility that the annual meeting be held as scheduled, but that the Bank continue to accept votes until May 24th. However, the error became academic when it nevertheless became necessary to adjourn the meeting as a result of the rulings made by the Federal Reserve Board in the letter issued in the afternoon of May 21st.

The most substantial issue raised by Dissidents concerns the procedure whereby the discretionary authority conferred by a white proxy remained in effect unless it was revoked by the stockholder. As Dissidents succinctly argue, "assumed acquiescence is no substitute for written affirmation." However, the letter accompanying the green-striped proxy clearly stated that "[t]he discretionary authority included in any proxies previously delivered on the WHITE proxy distributed with the April 9, 1991 proxy statement will, unless revoked, be used to vote AGAINST both of the recent shareholder proposals described above." Frumkin had discussed this provision over the telephone with members of the SEC staff as early as May 13, 1991, and it was included in every draft of the stockholders' letter which he submitted to the SEC.

■ Although the SEC required Management to modify its proposed green-striped materials in other respects, it did not comment adversely upon the "authority is effective until revoked" provision. To the contrary, counsel for the SEC approved it in a May 15th letter. The SEC's action in this respect is entitled to deference. *See, e.g., United Mine Workers v. The Pittston Co.*, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,946, 1989 WL 201060 (D.D.C. Nov. 24, 1989); *Newport News Shipbuild-*

*ing & Dry Dock Co. v. Howard*, 904 F.2d 206, 209 (4th Cir.1990). In any event, it was eminently correct. If Management had been required to solicit new proxies virtually at the last minute, it would have been substantially disadvantaged in the battle for control. By equal measure Dissidents would have been rewarded for their strategy of delay. Therefore, if the SEC had ordered that Management could not vote the white proxies, it would have set a precedent encouraging late filings by dissident groups in direct violation of the fundamental policy underlying the proxy rules of promoting the circulation of full, accurate and *timely* information to the stockholders.

### C.

■ Dissidents' final contention regarding the white proxies is based upon the fact that, contrary to the Bank's bylaws, the motion to adjourn the annual meeting until May 28 was not voted upon by the stockholders present at the meeting. Dissidents argue that because the SEC had required the adjournment as a condition to Management's vote of the white proxies, the irregularity in the adjournment procedure vitiated Management's use of the proxies.[5]

Dissidents' argument ignores the realities of the situation as it existed. Management had not wanted the adjournment; it ultimately assented to it solely because of the SEC's threat that it would file an enforcement action if the meeting was not adjourned. Management fully explained the reason for the adjournment at the meeting and was complying with its agreement with the SEC when it so moved.

Dissidents surmise that if the motion had been put to stockholder vote, it would have been defeated since Dissidents prevailed on every other issue which came before the meeting. Whether or not that is true is, of course, pure speculation. In any event, it is beside the point. The very purpose of the adjournment was to protect the fairness and integrity of the proxy process by

---

**5.** Dissidents initially raised the alleged unlawfulness of the adjournment as an independent issue. However, it cannot stand on its own since there were no material differences between the votes as cast at the stockholders meeting and those cast after the meeting had adjourned.

enabling all the stockholders, not simply those present at the meeting, to cast a fully informed vote on the question of control of the Bank. This purpose would have been defeated by permitting Dissidents to end the meeting on May 22nd. Under these circumstances technical compliance with a bylaw provision must yield to the dictates of federal law and policy.

### III.

As indicated above, one of the matters voted upon at the annual stockholders meeting was the selection of a firm to conduct the vote counts. The votes on this issue were tallied after the May 22nd session of the annual meeting had ended, and Dissidents prevailed. Their choice, CT, was selected over MHTC, which had counted the votes in the Bank's prior elections.

On June 11th CT issued its final report concerning Dissidents' proposals. The vote on the proposals was divided into two categories: "Amending By-Laws" and "Expanding Board." According to CT's final report, the votes were as follows:

### MAY 22

| | AMENDING BY-LAWS | EXPANDING BOARD |
|---|---|---|
| For: | 4,578,964 | 4,565,566 |
| Against: | 3,990,439 | 3,994,749 |
| Abstain: | 1,037,159 | 1,046,147 |

### MAY 28

| | AMENDING BY-LAWS | EXPANDING BOARD |
|---|---|---|
| For: | 5,226,136 | 5,212,395 |
| Against: | 4,234,839 | 4,242,056 |
| Abstain: | 1,100,091 | 1,106,615 |

Management contends that CT committed two errors in counting the votes. First, they argue that CT should have changed the vote of A. James Clark, the owner of 212,182 shares of stock, from "For" to "Against" in accordance with a letter sent by Clark to CT stating that he had erred in filling out his proxy. Second, they contend that CT should have placed 1,016,793 proxies voted by IECA and ADP in the "Against," rather than in the "Abstentions" column.

### A.

■ As a preliminary matter, Dissidents argue that CT's vote count is not judicially reviewable. In support of this argument, they cite § 1.09 of the Bank's bylaws, which provides as follows:

If demanded by stockholders, present in person or by proxy, entitled to cast 10% in number of votes entitled to be cast, or if ordered by the chairman, the vote upon any election or question shall be taken by

ballot and, upon like demand or order, the voting shall be conducted by two inspectors, in which event the proxies and ballots shall be received, and all questions touching the qualification of voters and the validity of proxies and the acceptance or rejection of votes shall be decided by such inspectors.

Dissidents contend that this bylaw leaves "no room for second-guessing the inspector's certified results" and that "its finality requirement is thus to be given full force and effect." Dissidents seem to be perceiving in the bylaw that which they want to see rather than that which is actually there. They point to the mandatory "shall be" phraseology. That language, however, merely provides that, as between contending factions within a corporation, a minority of at least 10% of the votes present can require that independent inspectors be appointed. Nothing in the bylaw states that the inspectors' decisions are not thereafter reviewable in court. The early Maryland case of *Triesler v. Wilson*, 89 Md. 169, 177, 42 A. 926, 927 (1899), upon which Dissidents rely, is distinguishable on that ground. There, the relevant bylaw required that an inspector's decisions be deemed "final and conclusive." *Triesler*, 89 Md. at 177, 42 A. at 927.

■ The applicability of Maryland law is itself in question, particularly in regard to the IECA and ADP issues. To the extent that a ruling made by CT is inextricably connected to the effectiveness of proxies given by beneficial owners of stock held in street name by a bank or brokerage firm, the federal interests in securities regulation and fair proxy contests predominate

and may well dictate the application of federal common law. If Maryland law is controlling, however, its common law precedents squarely establish a court's authority to review the decisions made by an election inspector. The precise parameters of that review need not now be decided. Undoubtedly, on matters which relate solely to an inspector's ministerial functions, substantial (if not complete) deference should be accorded to its findings. *See, e.g., Williams v. Sterling Oil of Oklahoma, Inc.*, 273 A.2d 264 (Del.1971); *Blausius Indus. Inc. v. Atlas Corp.*, 564 A.2d 651 (Del.Ch.1988). However, if the inspector has committed an error of law which has led to the disenfranchisement of a stockholder whose vote should be counted, that error is subject to full judicial review. *See, e.g., Talley v. Dadds*, 161 Md. 558, 562, 157 A. 775, 776 (1932); *Carey v. Pennsylvania Enter. Inc.*, 876 F.2d 333, 338, 341–42 (3d Cir.1989) (Pennsylvania law); *Salgo v. Matthews*, 497 S.W.2d 620, 628 (Tex.Civ. App.1973) (Texas law).[6]

### B.

■ The facts relating to Management's challenge on the Clark issue may be briefly stated.[7] Clark first returned a white proxy and, according to an affidavit which he has submitted, thereafter remained in Management's camp. However, after he sent in his white proxy, his secretary erroneously placed one of Dissidents' blue proxies in a pile of documents for him to sign. He then mistakenly signed and mailed in that proxy. He did not realize his error until after May 28th, the day on which voting closed. On May 31st he sent a letter to CT describing his mistake and offering to give sworn

---

**6.** Dissidents point to the absence of any Maryland statute providing for judicial review. They point out that § 225(b) of the Delaware Corporation Law provides for review by the Court of Chancery of the results of a stockholder vote on any matter other than the election of directors, officers or members of the governing body. However, in light of the established judicial precedent in Maryland permitting judicial review of election results, it is clearly improper to draw an inference from subsequent legislative inaction that the General Assembly intended to curtail judicial review. *See generally Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,

456 U.S. 353, 379–82, 102 S.Ct. 1825, 1839–41, 72 L.Ed.2d 182 (1982); *Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979).

**7.** I might note that the Clark issue has become somewhat academic. Management originally raised it as a contingency if Dissidents made their own challenges to CT's rulings. Dissidents have not done so, however, and thus resolution of the Clark issue alone in favor of Management would not materially affect the results of the election.

testimony as to what had occurred. CT refused to consider this letter and voted Clark's shares in accordance with the blue proxy which he had returned.

Management argues that since CT had received notification from Clark prior to its announcement of its final tally, it should have changed Clark's vote in accordance with his request. I do not agree. There is no evidence that Management lobbied Clark after May 28th to change his vote or that Clark approached Management for any improper purpose. However, this is an issue on which a bright-line test is a necessity. The vote must stand as cast when the polls close. To hold to the contrary would encourage unscrupulous partisans to make after-the-fact deals in any close election and result in swearing contests which are beyond the competence of any court effectively to resolve. CT's ruling on the Clark issue was absolutely correct.

### C.

1. *Background of the IECA/ADP Challenge*

■ IECA and ADP were retained by brokerage firms and banks which hold Bank stock in street name on behalf of beneficial owners. IECA and ADP were to (1) distribute proxy materials to the beneficial owners in connection with the annual stockholders meeting, (2) receive voting instructions from the owners and (3) tabulate the votes and transmit the results to the election inspector. The use of agents such as IECA and ADP are permitted by the

SEC. *See* 17 C.F.R. §§ 240.14b–1—240.-14b–2 (1990).

IECA and ADP received Management's initial proxy statement and white proxy on or about April 9, 1991. They promptly mailed the proxy statement to the beneficial owners of the Bank's stock. In accordance with their usual practice in uncontested elections, they did not send the actual white proxy but instead sent a voting instruction form and an explanatory letter.

The voting instruction forms sent out by IECA and ADP were similar but not identical to the white proxy.[8] They numerically listed the first three items appearing on the white proxy and had voting blocks next to them. The fourth item (which was unnumbered) read " *NOTE* SUCH OTHER BUSINESS AS MAY PROPERLY COME BEFORE THE MEETING OR ANY ADJOURNMENT THEREOF." As on the white proxy, no voting blocks accompanied this item. Nor did the voting instruction form contain an explanatory statement under the fourth item. Instead, in the accompanying explanatory letter there was a paragraph which read:

> [I]n order for your securities to be voted on all matters, please give your instructions above your signature on the attached proxy form and return it promptly in the enclosed business reply envelope. It is understood that, if you sign without otherwise marking the form, you wish to vote the securities as recommended by the Board of Directors on

---

**8.** The first paragraph of the white proxy read as follows:

> The UNDERSIGNED stockholder of Baltimore Bancorp hereby appoints [representatives of Management] with full power of substitution to vote, as designated below, all shares of common stock of the Corporation which the undersigned is entitled to vote at the annual meeting of stockholders called to convene on May 22, 1991, and at any and all adjournments thereof with respect to the matters set forth below and described in the Notice of Annual Meeting and Proxy Statement dated April 9, 1991.

Four items as to which votes were being solicited were then listed: (1) the election of directors, (2) a stockholder proposal to establish a stockholders' advisory committee, (3) a stock-

holder proposal to recommend the redemption of the rights issued under the Bank's share purchase rights plan and (4) the discretionary authority for Management's designees to vote "on such other matters as may properly come before the meeting." Under the first three listed items there were voting blocks available to be checked. Under the fourth item the following statement appeared:

> Shares represented by all properly executed proxies will be voted (or the vote on such matters will be withheld on specific matters) in accordance with instructions appearing on the proxy. **In the absence of specific instruction, proxies will be voted FOR proposal 1, AGAINST proposals 2 and 3 and in the discretion of the proxyholders as to any other matters.**

ALL matters to be acted upon at the meeting.[9]

711,716 votes were cast through IECA and 305,077 votes were cast through ADP in connection with the these documents.[10] IECA and ADP transmitted these votes to CT on voting summary sheets, which CT treated as the proxies to be counted. The summary sheets each contained, virtually verbatim, the language from the white proxy which authorized Management's designees to vote shares "with respect to the matters set forth below and described in the Notice of Annual Meeting and Proxy Statement dated April 9, 1991." The April 9th proxy statement, in turn, concluded by stating: "The Board of Directors knows of no other business which will be brought before the meeting, but if other matters do properly come before the meeting, it is the intention of the persons named in the enclosed proxy to vote such proxy in accordance with their best judgment with respect thereto."

### 2. *CT's Ruling*

In its tabulation, CT counted all of the votes appearing on IECA's and ADP's white proxy summary sheets as abstentions on Dissidents' proposed amendments. Management challenged this ruling, contending that the proxies conferred discretionary authority upon their designees and that therefore votes should have been counted in the "Against" column. CT denied the challenge, stating somewhat Delphically:

> CT, as inspector, is limited to the books and records of the corporation and the face of the proxy or proxies. As the proxies specifically revoked prior proxies, only the latest dated valid proxy was considered. CT looked only at these proxies in determining whether or not authority was granted to the proxy committee to exercise this discretion. On

these proxies, discretion was not granted.

Management attacks the factual premise of this ruling. It points out that CT could not have "looked only at these proxies," i.e. the summary sheets, in counting the vote. The summaries listed the three specific proposals being voted upon by number only. Therefore, they were incomprehensible without reference to the white proxy or the April 9th proxy statement.[11] The white proxy showed on its face that discretionary authority was being conferred upon Management's designees, and Management contends that the proxy statement did so as well. Furthermore, the summaries themselves contained language, similar to that in the white proxy, which appointed Management's designees as the voter's proxy holder and which incorporated by reference the proxy statement.

Dissidents allege that Management misinterprets the documents. First, according to Dissidents, although CT certainly had a number of white proxies before it from other voters, it did not have before it white proxies from the beneficial owners of the shares in question since the white proxy had not itself been sent by IECA and ADP to them. Therefore, although Dissidents concede (subject, of course, to their arguments addressed earlier in this opinion) that the white proxy conferred discretionary authority, they contend that it was not the white proxy but the April 9th proxy statement to which CT was obligated to turn in deciphering the summary sheets. As to the proxy statement itself, Dissidents allege that its last sentence did not constitute a conferral of discretionary authority. Countering Management's incorporation by reference argument, Dissidents add that the clause upon which Management rely— "with respect to the matters set forth below and described in the notice of annual meeting proxy statement dated April 9,

**9.** This language was contained in IECA's letter. ADP's letter, while not a verbatim replica of IECA's, was substantially identical to it.

**10.** IECA and ADP also later distributed Dissidents' blue proxy and Management's green-striped proxy to the beneficial owners. The

votes in connection with these proxies were separately recorded and are not at issue here.

**11.** It is agreed by the parties that CT did not have before it the voting instructions form sent out by IECA and ADP.

1991"—should be read as relating solely to the three specific items listed on the voting instruction form.

It is on technicalities such as these that Dissidents would have the fate of the Bank turn. I am not persuaded by the arguments which they have advanced. I have no doubt that within the confines of its specialized expertise CT acted in good faith. However, it is simply beyond the competence of an election inspector (whom Dissidents themselves characterize as performing merely ministerial functions) to decide the issues here presented. Myopia is not vision, and casuistry is no substitute for reason and common sense. In the final analysis it is simple facts which speak the loudest, and, viewing the record as a whole (either as it now exists or as it existed before CT), I cannot conclude that it was at all reasonable for CT to close its eyes to the substance of the proxy materials before it.

### IV.

In any event, I do not consider the propriety of CT's decision to count the votes as abstentions as being ultimately dispositive. Whether it is assumed that CT properly placed the IECA/ADP proxies in the "Abstention" column or that CT should have voted the proxies against Dissidents' proposed amendments, the result is the same: a new election is required.[12]

If the former assumption is made, IECA and ADP would be found to have erred in the manner in which they communicated with the beneficial owners and with CT.

Dissidents demur on this point, saying that if that be so the Bank's remedy lies solely in an action against IECA and ADP. On matters of such critical importance as those presented here, however, that response is insufficient. Any remedy against IECA and ADP is purely theoretical and without substantial worth to Management or the stockholders whose votes are in question. The SEC and New York Stock Exchange ("NYSE") rules concerning proxy solicitations from beneficial owners of stock held in street name are intended to establish a mechanism by which banks and brokerage firms, as the record holders of the stock, serve as passive conduits for votes cast by the beneficial owners. *See generally* 17 C.F.R. 240.14b–1; 17 C.F.R. 240.14b–2(c)(1)(ii) (1990); NYSE Rules 450–52.[13] The fundamental policy premise underlying these rules is that the right to vote effectively resides in the beneficial owners. Here, if CT's ruling were simply affirmed without the election results being voided, this policy would be undermined. The owners of more than one million shares would be disenfranchised because of a breakdown in the proxy process over which they had no control.

Merely reversing CT's ruling would yield no better result. Such a reversal would have the effect of taking the 1,016,793 votes from the "Abstention" column and placing them in the "Against" column. Clearly, this would be proper only if it can be reasonably inferred from the record that this was the intent of the holders of those shares. An examination of the relevant

---

**12.** An ancillary consideration emphasizing the need for a new election is the fact that the record establishes that if MHTC had been selected as the election inspector instead of CT, it would have counted the IECA/ADP votes *against* Dissidents' proposed amendments. Public confidence in the proxy process would be severely undermined if the result of an important election turned upon the fortuity of which firm was selected to perform the ministerial task of counting votes.

**13.** Dissidents argue that NYSE Rule 452.11 prohibits a member of the New York Stock Exchange from ever giving in a contested election

a proxy which confers discretionary authority. Their construction of the rule is incorrect. In general, it simply prohibits a member firm from giving in a contested election *any* proxy without having been instructed by the beneficial owner to do so. The intent of the rule is to prohibit a NYSE member firm from exercising discretion of its own on a contested matter. No contention is made here that IECA or ADP did so. Rather, the question presented is whether the voting instruction forms returned by beneficial owners of the Bank's stock constituted the giving of specific instructions as required by the rule.

materials does not permit such an inference.[14]

As set forth above, the voting instruction form and explanatory letter sent by IECA and ADP to beneficial owners in lieu of the white proxy were somewhat different from the white proxy. The white proxy stated (in bold type) as follows: "In the absence of specific instruction, proxies will be voted FOR proposal 1, AGAINST proposals 2 and 3 and in the discretion of the proxyholders as to any other matters." The same language was not contained on IECA's and ADP's voting instruction form. Instead, there was a sentence in the explanatory letter which, although comparable, was worded differently: "It is understood that, if you sign without otherwise marking the form, you wish [us] to vote the securities as recommended by the Board of Directors on ALL matters to be acted upon at the meeting."

This latter sentence is patently ambiguous. What does the phrase "if you sign without otherwise marking the form" mean? Management argues that it means that the stockholder must affirmatively write on the form that he declines to grant discretionary voting authority to Management's designees. However, the phrase does not expressly so state, and a reasonable stockholder could readily infer that by voting against Management on one or more of the listed proposals in the blocks provided, the stockholder was "otherwise marking" the form within the meaning of the explanatory letter.

Management argues that even if this is so, the May 16th letter sent by Management to the stockholders with the green-striped proxy cleared up the ambiguity.

According to Management, that letter put all stockholders on notice that if they had returned the white proxy (or, in the case of beneficial owners of stock held in street name, IECA's or ADP's voting instruction form), they had conferred discretionary authority upon Management which would, unless revoked, be used to vote against Dissidents' proposed amendments. In fact, however, the May 16th letter only added to the confusion. Its sentence concerning the revocation of authority referred only to the white proxy itself, not to the IECA/ADP voting instruction forms: "The discretionary authority included in any proxies previously delivered on the WHITE proxy distributed with the April 9, 1991 proxy statement will, unless revoked, be used to vote AGAINST both of the recent stockholder proposals described above." Since beneficial owners of stock held in street name had not received (and therefore had not delivered) any white proxy, they reasonably could have inferred that the sentence did not apply to them.

This inference would have been reinforced by two other sentences, specifically addressed to the beneficial owners, contained in a block at the bottom of the letter: "If your shares are held in 'street name,' only your bank or broker can vote your shares, and only upon receipt of your specific instructions. Please contact the person responsible for your account and instruct him or her to sign, date and deliver the WHITE card with the green stripe as soon as possible." These directions, especially when considered against the background of the original ambiguity in the explanatory letter accompanying the IECA/ADP voting instruction forms, could certainly have induced beneficial owners

---

**14.** Approximately 316,000 of the 1,016,793 proxies in question were voted against Management on at least one of the three items specifically listed on the voting instruction form and in the April 9th proxy statement. Dissidents argue that it should be inferred that the holders of these shares did not intend to give discretionary authority to Management's designees to vote against Dissidents' proposed amendments. This inference is impermissible. A stockholder may well have concluded both to vote against Management's slate of directors (and/or to vote against Management on one of the other two listed proposals) and to give Management discretionary authority to vote against Dissidents' proposed amendments. In so doing the stockholder would have been following what was perhaps the wisest course: sending a message of protest to Management but preserving the stability of the Bank by rejecting the proposed amendments, which would result in abrupt and radical change in leadership. This was the view eventually adopted by Institutional Shareholders Services, Inc. ("ISSI") after Dissidents distributed their proxy materials. ISSI recommended to its clients that they vote for Dissidents' six nominees for directors but against Dissidents' proposed amendments.

who did not wish to confer discretionary authority upon Management to "stand pat." They could reasonably have inferred that unless they returned the green-striped proxy as directed, they would not grant discretionary authority to Management's designees to vote against Dissidents' proposals. This would be particularly true as to any beneficial owners who had "otherwise marked" their initial voting instruction forms by voting against Management on at least one of the listed proposals.

Under these circumstances no one can discern the true intentions of the beneficial owners of the 1,016,793 shares that were voted through IECA and ADP. Therefore, although I am not unmindful of the substantial cost and, perhaps even more importantly, the continuing uncertainty to which another election will subject the Bank, I have concluded that a new election is the only effective remedy which can be granted. I will enter herewith an order directing that such an election be promptly held and formally declaring the rulings which I have made in this opinion. I will stay my order pending an appeal by either party to the Fourth Circuit or until a further order of this Court.

### ORDER

For the reasons stated in the opinion entered herein, it is this 21st day of June 1991

ORDERED

1. It is hereby declared that:

(a) The provision in § 7.07 of the bylaws of Baltimore Bancorp (the "Bank") requiring "the affirmative vote of the holders of at least 80% of the voting power of all classes of shares entitled to vote in the election of directors shall be required to amend, repeal, or to adopt any provision inconsistent with Sections 2.01 through 2.06 of the By-Laws" is in violation of Md.Corps. & Ass'ns Code Ann. § 2-506(a)(2) ("GCL § 506(a)(2)") and is invalid;

(b) The term "votes cast" in GCL § 2-506(a)(2) does not include abstentions;

(c) The designees of Management of the Bank properly exercised the discretionary authority conferred upon them by the white proxies sent out by the Bank on or about April 9, 1991, which were subsequently signed and returned;

(d) The Corporation Trust Company ("CT") properly counted the vote of A. James Clark, the owner of 212,182 shares of the Bank's stock, as being "For" the proposals of Baltimore Bancorp Stockholders Committee ("Stockholders Committee") in accordance with the blue proxy which Clark returned; and

(e) CT improperly counted the 1,016,793 proxies voted by Independent Election Corporation of America and ADP Financial Information Services, Inc. as "Abstentions;"

2. This Court expressly determining that there is no just reason for delay, the declaratory judgments set forth in paragraph 1 are directed to be entered as a final judgment pursuant to Fed.R.Civ.P. 54(b);

3. The motion to dismiss filed by the Stockholders Committee in Civil No. JFM-91-1410 is denied;

4. A new election on the proposals presented by the Stockholders Committee in its proxy materials filed with the Securities and Exchange Commission on May 10, 1991 promptly be held;

5. The ten persons nominated by the Stockholders Committee to serve as the Bank's directors in the ten new positions created by the aforesaid proposals of the Stockholder Committee are enjoined from taking office unless a new election on the proposals is held which results in their passage by a majority of the Bank's stockholders; and

6. This order be stayed pending an appeal by either party to the United States Court of Appeals for the Fourth Circuit or until further order of this Court.